**No. 21-40811**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States of America,

Plaintiff - Appellee

v.

Moses Moreira,

Defendant – Appellant

**On Appeal from**
United States District Court for the Eastern District of Texas

4:19-CR-316-1

**BRIEF OF APPELLANT MOSES MOREIRA**

SUBMITTED BY:

Jason B. Freeman
FREEMAN LAW, PLLC
7011 Main Street
Frisco, Texas 75034

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5ᵗʰ CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| United States of America | Bradley Visosky of U.S. Attorney's Office Plano, TX |
| United States of America | Anand Varadarajan of U.S. Attorney's Office Plano, TX |

| Appellants: | Counsel for Appellants: |
| --- | --- |
| Moses Moreira | Jason Freeman of Freeman Law, PLLC Frisco, TX |

*/s/ Jason B. Freeman*
Attorney of record for Defendant-Appellant

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

# TABLE OF CONTENTS

Page(s)

CERTIFICATE OF INTERESTED PERSONS ..................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ..................................................... iii

TABLE OF CONTENTS ..................................................... iv

TABLE OF AUTHORITIES ..................................................... vi

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................................................... 2

STATEMENT OF THE CASE ..................................................... 3

   Procedural History, Facts, & Course of Proceedings Below ..................................................... 3

      *The Offense & Guilty Plea* ..................................................... 3

      *The Presentence Report and Objections* ..................................................... 5

      *The Sentencing Hearing and the Judgment* ..................................................... 10

SUMMARY OF THE ARGUMENT ..................................................... 14

ARGUMENT AND AUTHORITIES ..................................................... 17

   **I. THE DISTRICT COURT MADE MULTIPLE REVERSIBLE LEGAL AND FACTUAL ERRORS IN DECIDING WHETHER TO APPLY USSG § 3B1.1(B), AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPLICATION OF THE ENHANCEMENT.** ..................................................... 17

     **A. Standard of Review & Burden of Proof** ..................................................... 17

     **B. Application of the Enhancement – Proper Interpretation** ..................................................... 18

     **C. Erroneous Factual Conclusions** ..................................................... 20

     **D. Erroneous Legal Conclusions** ..................................................... 25

     **E. Evidence was Insufficient to Meet the Government's Burden of Proof** . 27

   **II. THE DISTRICT COURT MADE A REVERSIBLE FACTUAL ERROR IN DECIDING WHETHER TO APPLY USSG § 2B1.1(B)(2)(D) AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT ITS APPLICATION.** ..................................................... 29

     **A. Standard of Review & Burden of Proof** ..................................................... 29

     **B. Application of the Enhancement** ..................................................... 30

**C. Error and Insufficiency of the Evidence** ............................................................... 30

**III. THE DISTRICT COURT MADE REVERISBLE LEGAL AND FACTUAL ERRORS IN DECIDING WHETHER TO APPLY § 3A1.1, AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPLICATION OF THE ENHANCEMENT.** ................................. 34

**A. Standard of Review & Burden of Proof** ................................................................ 34

**B. Application of the Enhancement** ............................................................................. 36

**C. Erroneous Legal and Factual Conclusions** ........................................................... 37

**D. Insufficiency of the Evidence** .................................................................................. 40

**IV. THE APPELLANT SUFFERED FROM A LACK OF DUE PROCESS IN THE CARRYING OUT OF THE CRIMINAL PROCESS AGAINST HIM AND THIS COURT SHOULD ACT TO REMEDY THE DENIAL OF DUE PROCESS** ................................................................................................. 45

**A. Restricted Access to Counsel and to Discovery due to Protective Order and Covid-19** ....................................................................................................................... 45

**B. Ineffective Assistance of Counsel** ........................................................................... 47

CONCLUSION ..................................................................................................................... 48

CERTIFICATE OF SERVICE ........................................................................................... 49

CERTIFICATE OF COMPLIANCE ................................................................................. 49

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 17

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) ....................................................... 45

*Rosales-Mireles v. United States,* 850 F. 3d 246 (U.S. 2018) ................................. 35

*United States v. Allen*, 533 F. App'x 406 (5th Cir. 2013) ....................................... 36

*United States v. Armstrong*, 550 F.3d 382 (5th Cir. 2008) ..................................... 17

*United States v. Blanco-Rodriguez,* 755 F. App'x 339 (5th Cir. 2018) .................. 18

*United States v. Booker*, 544 U.S. 220 (2005) ........................................................ 44

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012) ........................................... 45

*United States v. Creech*, 913 F.2d 780 (1990) ........................................................ 42

*United States* v. *Dominguez Benitez,* 542 U.S. 74 (2004) ...................................... 35

*United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) ............................................ 30

*United States v. Elwood*, 999 F.2d 814 (5th Cir. 1993) .......................................... 18

*United States v. Evbuomwan*, 992 F.2d 70 (5 Cir. 1993) ....................................... 18

*United States v. Frank*, 247 F.3d 1257 (11th Cir. 2001) ......................................... 42

*United States v. Fuentes*, 775 F.3d 213 (5th Cir. 2014) .......................................... 18

*United States v. Garcia-Carrillo,* 749 F.3d 376 (5th Cir. 2014) ............................ 35

*United States v. Gordon*, 838 F.3d 597 (5th Cir. 2016) .......................................... 35

*United States v. Gutierrez–Hernandez,* 581 F.3d 251 (5th Cir. 2009) ................... 17

*United States v. Harris*, 821 F.3d 589 (5th Cir. 2016) ........................................... 30

*United States v. Hudson*, 822 F. App'x 888 (11th Cir. 2020) ................................. 42

*United States v. Jenkins*, 712 F.3d 209 (5th Cir. 2013) ........................................... 34

*United States v. Mejia-Orosco*, 868 F.2d 807 (5th Cir.), *cert. denied*, 492 U.S. 924 (1989) ... 36

*United States v. Mergerson*, 4 F.3d 337 (5th Cir.1993) ................................... 18, 45

*United States v. Mondragon-Santiago,* 564 F.3d 357 (5th Cir. 2009) .................... 17

*United States v. Moree*, 897 F.2d 1329 (5th Cir. 1990). ......................................... 37

*United States v. Nava*, 624 F.3d 226 (5th Cir. 2010) .............................................. 19

*United States v. Ocana*, 204 F.3d 585 (5th Cir. 2000) ............................................... 35

*United States v. Olano*, 507 U. S. 725 (1993) ........................................................... 35

*United States v. Olivares*, 833 F.3d 450 (5th Cir. 2016) ........................................... 17

*United States v. Rocha*, 916 F.2d 219 (5th Cir.1990), *cert. denied*, 500 U.S. 934 (1991) ..... 36

*United States v. Smith*, 930 F.2d 1450 (10th Cir.), *cert. denied*, 502 U.S. 879 (1991) ......... 42

**Statutes**

18 U.S.C. § 1343 .......................................................................................................... 4

18 U.S.C. § 1349 .......................................................................................................... 4

18 U.S.C. § 3231 .......................................................................................................... 1

18 U.S.C. § 3553 ........................................................................................................ 44

18 U.S.C. § 3553(a) ......................................................................................... 10, 17, 44

18 U.S.C. § 3553(a)(4) .............................................................................................. 44

18 U.S.C. § 3742 .......................................................................................................... 1

28 U.S.C. § 1291 .......................................................................................................... 1

**Other Authorities**

USSG §2B1.1(b)(2)(D) ............................................................................................ 3, 29

USSG §3A1.1(b)(1) ................................................................................................. 3, 36

USSG §3A1.1(b)(1) cmt. n. 2 ..................................................................................... 36

USSG §3B1.1 ............................................................................................................. 21

USSG §3B1.1 cmt. n.2 ............................................................................................... 18

USSG §3B1.1 cmt. n.4 ............................................................................................... 19

USSG §3B1.1(b) .............................................................................................. 3, 17, 18

USSG §6A1.3 ......................................................................................................... 3, 17

# JURISDICTIONAL STATEMENT

1.      **Subject Matter Jurisdiction in the District Court**. This case arose from the prosecution of an offense against the laws of the United States of America. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

2.      **Jurisdiction in the Court of Appeals**. This is a direct appeal from a final decision of the U.S. District Court for the Eastern District of Texas, entering judgment of conviction and imposing a criminal sentence. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

3.      The district court entered a judgment verbally and confirmed it in writing on October 22, 2021 of a 168-month term of incarceration. (ROA.333:15-341:18, 158-165). The Appellant filed a notice of appeal on October 26, 2021 (ROA.166), which complies with Fed. R. App. P. 4.

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      Whether the district court committed reversible factual or legal error as it applied USSG § 3B1.1(b)?

II.     Whether the government presented sufficient evidence to meet its burden of proof on USSG § 3B1.1(b)?

III.    Whether the district court committed reversible factual or legal error as it applied USSG § 2B1.1(b)(2)(B)?

IV.     Whether the government presented sufficient evidence to meet its burden of proof on USSG § 2B1.1(b)(2)(B)?

V.      Whether the district court committed reversible factual or legal error as it applied USSG § 3A.1.1(b)(1)?

VI.     Whether the government presented sufficient evidence to meet its burden of proof on USSG § 3A.1.1(b)(1)?

VII.    Whether the particular circumstances of the Defendant's detention, plea and sentencing process demand application of a higher burden of proof in connection with any or all of the enhancements?

# STATEMENT OF THE CASE

The Appellant's longer-than-average sentence resulted from the trial court's application of several enhancements, including three challenged herein: USSG § 3B1.1(b), based on the Appellant's alleged status as a manager or supervisor; USSG § 2B1.1(b)(2)(d), for a loss amount of over $3,500,000; and USSG § 3A.1.1(b)(1), based on the victims' alleged vulnerable status.

## Procedural History, Facts, & Course of Proceedings Below
### *The Offense & Guilty Plea*

The government's investigation of Appellant Moses Moreira began after the "FBI became aware of and started investigating romance scams targeting elderly female victims" involving online communications with one or more fraudsters (ROA.576 ¶ 9). The modus operandi of these romance scams is that after a period of "social grooming, the online love interest requests money" for a concocted need. (ROA.576). Pursuant to such a scam, an individual, "BF," began sending money to her false love interest's purported secretary, Moses Moreira, because the love interest "did not have access to his bank account overseas." The government then began to investigate Moreira and found "red flags of potential money laundering and possible scam-related activity." The government's investigation found that the Appellant did not himself find, communicate with, or groom victims, but that he facilitated multiple swindles by receiving victim funds and transmitting them to co-conspirators. (ROA.257:14-22).

The United States filed a criminal complaint against Moreira on November 20, 2019. He has not been released from custody since he was incarcerated on November 21, 2019. On December 11, 2019 (ROA.22), the government filed the original indictment in this matter, charging Appellant with wire fraud under 18 U.S.C. § 1343. (ROA.397 ¶ 2). On November 25, 2019, Moreira waived in writing any right to a preliminary examination and hearing. (ROA.18). Later, under a superseding indictment filed by the government on February 10, 2020, the government added a charge for conspiracy to commit wire fraud under 18 U.S.C. § 1349 (ROA.89).

Initially, on March 18, 2021, Appellant entered a not-guilty plea in connection with the First Superseding Indictment ("*FSI*") and waived personal appearance at an arraignment (ROA.88). Later, Appellant's counsel filed a Notice of Intent to Plead Guilty to Indictment, which stated that Moreira intended "to plead guilty to the indictment without a plea agreement." (ROA.90). On March 29, 2021, the government filed a document titled "Elements of the Offense." (ROA.92). In anticipation of entering a guilty plea, Appellant consented to administration of a guilty plea and allocution by a US Magistrate Judge (ROA.95). Then, on April 1, 2021, Appellant entered a guilty plea. (ROA.106-112). Prior to entering his guilty plea, Appellant signed a document titled "Factual Basis" to substantiate elements of the crimes charged in the FSI (ROA.113). The trial court sentenced Moreira in a hearing held on October 22, 2021. (ROA.177-343).

**The Presentence Report and Objections**

The government filed a Presentencing Report ("*PSR*") on June 7, 2021, and a Fifth Revised PSR on October 13, 2021 (ROA.572). Trial counsel for the Appellant filed objections to the PSR on August 26, 2021 contesting the government's recommended findings that: (a) Appellant was a manager or supervisor, (b) the loss amount exceeded $3.5 million, and (c) the crime involved sophisticated means. (ROA.456 ¶¶ 41, 63, and 65, respectively). The PSR asserted that the vulnerable victim enhancement should not apply based on an incorrect reading of the application notes to the Sentencing Guidelines. At the sentencing hearing, the court applied the vulnerable victim enhancement on a *sua sponte* basis.

*General Allegations*

According to the PSR, "Moreira had a manager or supervisor role because he was working with 10-15 unindicted co-conspirators in Nigeria. Moreira was responsible for coordinating the actions of the individuals in Nigeria and he was responsible for receiving the money from the victims, directing co-conspirators where to deposit the money, and managing the money." (ROA.582 ¶ 41). The PSR asserted that the enhancement should apply because the "defendant set up bank accounts in the United States and he received the money from the victims." (ROA.588 ¶ 79).

Regarding the loss amount enhancement, the PSR stated that the loss was determined to be $4,440,005.15, for which there should be an offense level increase of 18 points. (ROA.588 ¶ 75). The PSR also included a chart setting forth the names of 97

alleged victims and furnished, as a total, the restitution amount owed by Moreira, which amount summed the alleged "total amount sent" by each alleged victim. (ROA.596-598 ¶ 134). In connection with the vulnerable victim enhancement, the PSR contained general allegations regarding the victims' age as being "older" or "elderly."

The PSR references the age of only two specific victims. One was 82 (ROA.584 ¶ 48); another was in her 60's. (ROA.584 ¶ 53). It specified the online means by which the conspirators found the victim in connection with only three of the victims. (ROA.577 ¶ 16, 579 ¶ 28, 581 ¶ 38). For most other victims, the PSR generally states that the victim met the false love interest online. Two others allegedly met their victimizers through unspecified dating websites. (ROA.576 ¶ 10, 578 ¶ 20). The PSR found that that the co-conspirators specifically "targeted women and men over age 65, who were widowed or widowers" and that the "defendant knew or should have known the victims of the offense were vulnerable victims." (ROA.587 ¶ 70).

*Specific Fact Allegations*

The PSR supplements its general statements and allegations with the following statements regarding specific victims:

Victim "BF" transferred to the Appellant and several allegedly related persons an aggregate amount of $773,623.25. (ROA.576 ¶ 14). But the PSR's restitution chart shows the amount transferred to the Appellant by BF was $152,600. (ROA.596-597). BF allegedly met her fraudulent love interest on an unnamed dating website (ROA.576 ¶ 10). There is no mention of her age or widow status.

Victim "JT" transferred an aggregate amount of $80,000 to multiple individuals, including the Appellant. (ROA.577 ¶ 16). JT met her fraudulent love interest on a website called "Plenty of Fish." The website does not appear to have any particular association with older or elderly people. *See* https://www.pof.com (last visited May 23, 2023). There is no mention of JT's age or widow status.

Victim "TKN" transferred to "various accounts, including Moreira's" an amount totaling $34,200 (ROA.578 ¶ 17). According to the restitution chart in the PSR, the amount transferred to the Appellant was $6,800 (ROA.560). The PSR doesn't say how TKN met her sham love interest, other than asserting that "she was first contacted" by a man who claimed to work in construction as a mason. (ROA.578 ¶ 17). There is no mention of her age or widow status.

"Female Victim 1" (FV1) transferred to the Appellant the amount of $22,500. (ROA.581 ¶ 40). However, this amount is not found in the restitution chart. (ROA.558-560). FV1 met her fraudulent online love interest through an online dating website for "50 and over singles." (ROA.578 ¶ 20). The PSR does not state any reason why FV1 was particularly vulnerable, it does not state her age, whether she was a widow or a divorcee, or whether she had any particular vulnerability that was targeted.

"Female Victim No. 2" (FV2) met her fraudulent love interest through an online game called "Words with Friends." (ROA.579 ¶ 28). This game does not appear to have any particular association with older or elderly people. *See* https://wordswithfriends.com (last visited May 23, 2023). FV2 ultimately transferred

to the Appellant the amount of $145,010. (ROA.581 ¶ 40). The PSR doesn't mention

FV2's age or any particular vulnerability (ROA.579 ¶¶ 28-37).

"Female Victim No. 3" (FV3) met her online romantic interest through an

online dating site called christianmingle.com. (ROA.581); *See*

https://www.christianmingle.com/en-us (last visited May 23, 2023). This website does

not appear to have any particular association with older or elderly people; rather, it

appears marketed towards individuals interested in dating who identify themselves as

Christians. Paragraph 39 states that FV3 transferred to the Appellant the amount of

$51,900. However, Paragraph 40 states that FV3's loss amount was $40,000. The PSR

doesn't mention her age but implies she may have been vulnerable because her husband

passed away four years earlier. (ROA.580 ¶¶ 38-39).

Paragraphs 45 through 56 address 12 victim impact statements made by

individual victims. (ROA.583-584). The PSR states that it summarizes all of the Victim

Impact Statements. (ROA.583 ¶ 44). One of these paragraphs relates to victim BF

mentioned above. The PSR does not clarify whether FV1, FV2, FV3 are among the

women who left Victim Impact Statements and the statements apparently do not

include victims JT and TKN. Therefore, at most, the PSR contains evidence regarding

17 victims, all of whom were female. For most of the victims, the PSR generally only

states that they met their scammer "online." None of the websites mentioned appear

to be associated with older or elderly people.

The PSR identifies as widows only three of the victims that filed impact statements, those with initials MK, MT, and ME. (ROA.545-546 ¶¶ 46-48). Many of the victim statements contained references to their continued ability to work. (ROA.509-510 ¶¶ 45, 48, 50, 53, 56).

Every victim who gave a victim impact statement and whose losses are discussed quantitatively in the PSR narrative, transferred less money to a Moreira-controlled account than they reported losing in the aggregate in connection with the respective romance scheme:

- BF lost either $773,623.25 (ROA.398 ¶11) or 1 million (ROA.405 ¶45) to fraudsters. But she transferred only $152,000 to Moreira-controlled accounts.[1] (ROA.596-598).

- ME lost $140,000 to fraudsters (ROA.584 ¶48). But she transferred only $56,000 to Moreira-controlled accounts. (ROA.596-598).

- JB lost $59,030 to fraudsters (ROA.584 ¶ 51). But she transferred only $19,000 to Moreira-controlled accounts. (ROA.596-598).

- EE lost $500,000 to fraudsters (ROA.584 ¶ 52). But she transferred only $10,000 to Moreira-controlled accounts. (ROA.596-598).

---

[1] Pamela Williams testified that the Restitution Chart with the "total loss amount" reported the amounts transferred to Moreira-controlled accounts per the investigation and the analysis and review of case documents and Moreira's bank records. (ROA.277-278).

- DS lost $102,350 to fraudsters (ROA.585 ¶ 53). But she transferred only $75,200 to Moreira-controlled accounts. (ROA.596-598).

Several victim statements clarified the reason for this apparent discrepancy: the Appellant was not involved in the entirety of the scam ran against each victim. For example, one victim stated, "the defendant came in during the second phase of the scam [sic]." (ROA.585 ¶ 53).

In addition to factual discrepancies noted above, there are important discrepancies between the information in the PSR and the testimony and evidence presented by the government at the sentencing hearing. These discrepancies call into serious question the credibility of the government's allegations and evidence, including the testimony and certain statements in the PSR.

### *The Sentencing Hearing and the Judgment*

The district court entered a judgment against the Appellant on October 25, 2021 overruling the Appellant's objections to the PSR (ROA.158). The judgment concluded that 168 months was appropriate pursuant to the sentencing guidelines and 18 U.S.C. § 3553(a). (ROA.158). The trial court heard testimony from FBI Agent Rennie, who led the investigation into Moreira, and heard from Pamela Williams, a forensic accountant at the FBI. Ms. Williams calculated the loss amount on which the government based its enhancement recommendation (ROA.260:14-266:14), which is the same or is approximately the same as amount for which the government requested a restitution

order (ROA.596 ¶ 134). Appellant's counsel cross-examined both witnesses. Appellant did not offer any testimony or witnesses.

### Manager Or Supervisor Enhancement

In response to the Appellant's objection, the government's counsel gave three reasons why the Appellant qualified as a manager or supervisor:

(1) The Appellant provided "instructions to co-conspirators as to where and how to send … money." (ROA.312:9-10);

(2) He "interfaced with his co-conspirators, frequently discussing how to troubleshoot issues that were coming up as the co-conspirators tried to get money from victims." (ROA.312:12-17); and

(3) He discussed "percentage cuts and fees that are supposed to be paid out to the other co-conspirators after Mr. Moreira receives the money" (ROA.210:10-12), or in the testimony of Agent Rennie, "negotiating percentages that the defendant would keep of the money that was sent to him." (ROA.202:2-9).

The Court found that the enhancement should apply for the following stated reasons:

(1) Mr. Moreira was "working with **a number of co-conspirators** to accomplish a **fraudulent scheme** that he's acknowledged involved **numerous victims**." (ROA.313:16-17) (emphasis added).

(2) "[A] lot of these **co-conspirators did not know each other**. He was the **central link** in the chain. He was the one who was **making this happen**." (ROA.313:22-24) (emphasis added).

(3) "[H]e **directed his co-conspirators on where and how money should be sent** by victims, troubleshooting issues with victims and telling them how to deal with victims, in addition to operating and maintaining these accounts." (ROA.314:1-4) (emphasis added).

(4) "We also have Mr. Moreira's **admission** of everything he did **after the money was deposited** in his accounts, which I detailed earlier; that **he was the one** who was largely involved in **using these trade-based money laundering** techniques for the group." (ROA.314:5-9) (emphasis added).

### *Loss Amount Enhancement*

The district court applied the § 2B1.1(b)(2)(d) loss amount enhancement after finding that the Appellant was responsible for a total victim loss above 3.5 million dollars, which led to an offense level increase of 18. (ROA.300:7-301:24). Notwithstanding the Appellant's objection, the court found that (1) the Appellant had admitted to a loss amount exceeding 4 million dollars by executing the Factual Basis and by entering a guilty plea, and (2) the government's evidence established losses exceeding $3.5 million by a preponderance of the evidence.

### *Vulnerable Victim Enhancement*

The district court noted the PRS's incorrect reading of the Guidelines and acted *sua sponte* to apply the vulnerable victim enhancement, resulting in an offense level of 33 instead of 31 as recommended in the PSR. (ROA.319:22-320:6). Other than the single victim impact witness, Agent Rennie was the only person to offer testimony related to victim vulnerability.

The court found that the enhancement should apply because of "a combination" of factors. The court referenced testimony that many of the victims "were older," "over 55," and were "emotionally vulnerable" because they were "widowed or otherwise going through difficult circumstances." (ROA.319:2-5). The court also noted its belief that the victims who rendered the statements were "representative" of all the victims in that they were not young, they were "emotionally vulnerable" because "they've been widowed" or "recently divorced" or because of other circumstances in their life."

# SUMMARY OF THE ARGUMENT

The district court's decisions to impose enhancements under §§§ 3B1.1(b), 2B1.1(b)(2)(d), and 3A1.1 of the United States Sentencing Guidelines were rooted in multiple factual and legal errors or were not supported by sufficient evidence.

The court incorrectly found that Moreira managed co-conspirators by telling them where and how to have victims send their funds so that he could launder them for his co-conspirators. These communications were not managerial but merely facilitative to enable his services. Further, the Appellant's criminal activity involved a multiplicity of criminals and victims, but the evidence strongly indicated that he worked as an independent service provider and there was no evidence he managed or supervised a team or any individual. By inferring from a multiplicity of co-conspirators and victims that Moreira managed other participants in a criminal organization of more than five people, the court improperly shifted the burden of proof to the Appellant on these issues. Additionally, there was not sufficient evidence to meet the government's burden of proof to support application of the enhancement.

In imposing an enhancement for losses exceeding $3,500,000, the court made several errors. First, the court erred in concluding that the Appellant had admitted to the loss amount asserted in the FSI. Additionally, the court erred in finding sufficient evidence to support facts to prove the enhancement. Essentially, in computing the loss amount, the government assumed that because the Appellant received a deposit or wire

from a third party, the transaction reflected a victim loss. Therefore, the PSR and other evidence lacked sufficient indicia of reliability to credit the government's assertions as to the loss amount. The court's finding of losses exceeding $3,500,000 replicated the government's improper inference and, therefore, improperly shifted the burden of proof to the Appellant.

The court's finding that the vulnerable victim enhancement applied, was improper. The court determined that the Appellant and his co-conspirators targeted single elderly people who were recently divorced or widowed because several of the victims discussed in the PSR were elderly and single and divorced or widowed. That determination suffers from several errors: (a) elderly people, including divorcees and widows, are not vulnerable per se as a matter of law, (b) it is an incorrect logical and legal inference to assume that the entirety of a universe (i.e., all transferors of funds to Moreira accounts) is the same as a part of that universe (i.e., the known victims), and (c) it assumes that because some members of the victim group have common characteristics, the scammers must have necessarily sought victims with those characteristics. These impermissible inferences stand on the improper, incorrect, and evidentially unsupported inferences that the Appellant and his co-conspirators were a single criminal organization that ran a single scheme.  Consequently, and because no evidence showed that the Appellant had any knowledge of the specific characteristics of a victim or any particular *unusual* vulnerability prior to receiving that victim's money,

there was not sufficient evidence to conclude that the Appellant knew or had reason to know of the vulnerable status of a victim.

Finally, Appellant suffered from a lack of due process. In connection with the entry of his guilty plea and at sentencing, Appellant suffered from ineffective assistance of counsel. Additionally, probably due to the commencement of the Appellant's criminal proceedings and the pandemic at similar moments in time, in combination with a strict Protective Order in the case, Appellant never had the opportunity to access and review the evidence against him obtained by the United States. The evidence was used by the government in creating the PSR and in preparing the presentation, testimony, and materials shown to the court at sentencing. Some of the evidence may constitute "Brady material," which could and should have been used by Appellant's counsel to argue for the entry of a lesser sentence against Appellant. Due process requires the resentencing of the Appellant. Because due process issues plagued the pandemic-era process under which the Appellant was charged and convicted, this Court should require any reviewing court to determine the Appellant's case after applying a heightened burden of proof to the applied sentencing enhancements or require that the Appellant has had the opportunity to review the evidence compiled by the government prior to his resentencing.

# ARGUMENT AND AUTHORITIES

I.     **THE DISTRICT COURT MADE MULTIPLE REVERSIBLE LEGAL AND FACTUAL ERRORS IN DECIDING WHETHER TO APPLY USSG § 3B1.1(b), AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPLICATION OF THE ENHANCEMENT.**

### A. Standard of Review & Burden of Proof

This Court reviews sentences for reasonableness under an abuse-of-discretion standard in two stages. *United States v. Mondragon-Santiago*, 564 F.3d 357, 360 (5th Cir. 2009), *cert. denied*, 558 U.S. 871 (2009). The first stage involves a review for procedural error, for example, by miscalculating the relevant sentencing range, failing to consider the 18 U.S.C. § 3553(a) factors, or basing a sentence on clearly erroneous facts. *Id.* In doing so, this Court reviews the district court's "interpretation or application of the sentencing guidelines *de novo*, and its factual findings for clear error." *United States v. Gutierrez–Hernandez*, 581 F.3d 251, 254 (5th Cir. 2009) (quoting *United States v. Armstrong*, 550 F.3d 382, 404 (5th Cir. 2008)). If the sentence is procedurally proper, the court performs a substantive review. *Mondragon-Santiago*, 564 F.3d at 360.

The government has the burden of demonstrating facts that are necessary to support an enhancement by a preponderance of the evidence. *United States v. Olivares*, 833 F.3d 450, 452 (5th Cir. 2016). Moreover, guideline enhancements may not be imposed on the basis of clearly erroneous facts *See Gall v. United States*, 552 U.S. 38, 51 (2007). Factual findings made by the district court must be premised on information with "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3.

This standard does not merely require that the evidence be credible – it also forbids drawing inferences in favor of an enhancement where the evidence is tenuous or equivocal.[2] This Court "do[es] not tolerate inferences based on inferences." *United States v. Evbuomvan*, 992 F.2d 70, 74 (5 Cir. 1993). Generally, a PSR has sufficient indicia of reliability to be considered for fact-finding in sentencing determinations. *United States v. Fuentes*, 775 F.3d 213, 220 (5th Cir. 2014). However, "[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR." *United States v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993).

## B. Application of the Enhancement – Proper Interpretation

USSG § 3B1.1(b) states, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." USSG § 3B1.1(b). The Application Notes clarify the meaning of the terms "manager or supervisor" and "criminal activity."

Application Note 2 states "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1 cmt. n.2; *see United States v. Blanco-Rodriguez*, 755 F.

---

[2] *See United States v. Jobe*, 101 F.3d 1046, 1065 (5th Cir. 1996) (evidence that defendant acted as a bank manager did not adequately support district court's inference that the defendant directed others in check-kiting at his bank); *United States v. Whittington*, 269 Fed. Appx. 388, 403 (5th Cir. 2008)(district court not permitted to presume that drug deliveries occurred after defendant entered the conspiracy where record was silent as to their date); *United States v. Mergerson*, 4 F.3d 337, 347 (5th Cir. 1993)(district court erred in increasing the defendant's sentence on the basis of an ambiguous piece of paper that might have referred to grams of heroin, but could have "just as easily" referred to dollar amounts or other drugs).

App'x 339, 342 (5th Cir. 2018). Further, Application Note 4 establishes that in distinguishing roles of managers or supervisors from leadership and organizational roles, courts are to consider, among other things, the accused's exercise of decision-making authority, recruitment, claimed rights to relative shares of profits, and **the degree of control and authority exercised over others**." USSG § 3B1.1 cmt. n.4; *see United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010). Together these application notes clarify that the enhancement is applicable only to defendants who **managed or supervised other individuals** involved in the criminal activity, by exercising a "degree of **control and authority**" over those persons.

The Guidelines further clarify that the manager or supervisor enhancements only apply to the extent there exists **a criminal organization**:

> <u>Background</u>: This section provides a range of adjustments to increase the offense level based upon the **size** of a criminal **organization** (<u>i.e.</u>, the number of participants in the offense) and **the degree to which the defendant was responsible** for committing the offense. This adjustment is included primarily because of concerns **about relative responsibility**.

(USSG § 3B1.1 cmt. n.4)

Accordingly, to sustain application of the enhancement, the trial court's finding had to support the following conclusions: (1) Appellant was part of a criminal organization (whether on an ad hoc or continuing basis) that consisted of more than five people; and (2) the Appellant managed or supervised as least one participant in the criminal organization. The trial court's application of the enhancement constituted clear error because it: (a) misinterpreted the enhancement's application, (b) reached clearly

erroneous factual and legal conclusions, and (c) because the government's evidence was insufficient to support the necessary findings.

**C. Erroneous Factual Conclusions**

**1. The Court expressly concluded that the Appellant and his co-conspirators interacted in a single fraudulent scheme and, impliedly, that they constituted one "group" of more than 5 people.**

The PSR asserted that Appellant worked with 10 to 15 co-conspirators in Nigeria (ROA.582 ¶ 41) and at sentencing, Agent Rennie stated that he communicated via WhatsApp with approximately 32 co-conspirators (ROA.201:22-24). However, the record does not support the conclusion that the Appellant's co-conspirators were part of the same criminal organization.

Although Agent Rennie testified that Moreira's crimes involved a single organization and that he "organized the scheme, (sic) directed the scheme," other facts, including his own more specific testimony directly contradict that allegation. (ROA.211:8-11). For example, Rennie testified on cross-examination that the crimes involved "individual co-conspirators, many of which that (sic) do not know each other, but the common thread is Mr. Moreira. And the reason that they're contacting Mr. Moreira is because Mr. Moreira has bank accounts." (ROA.255:16-22). He continued and reiterated, "[i]f not for Mr. Moreira, there would be no common thread." (ROA.255:23-24).

Accordingly, the record shows that the Appellant's crimes involved collaboration with separate individual co-conspirators that associated with Moreira on an ad hoc basis in separate scams. The government's evidence indicated that the co-conspirators were all people that contacted Mr. Moreira because he had bank accounts and could receive and transmit money. For many of the co-conspirators, their only connection is that they sent funds to the Appellant (or had their victims do so). Therefore, the government's evidence showed that Moreira and at least "many" of his co-conspirators constitute "a group" only to the extent that all the co-conspirators can be defined as criminals that worked at least once with Moreira. The record does not show they worked together in an organization within the meaning of USSG § 3B1.1.

**2. The court concluded that because the Appellant collaborated to swindle victims (being "the central link in the chain") with many co-conspirators among which he was the only connection, he was necessary to the scams and a manager or supervisor of a criminal organization with more than 5 participants.**

The record demonstrates that Moreira was not necessary to the scams. First, other individuals interfaced with the victims who contacted the Appellant if they needed or wanted a location to send a victim's funds. (ROA.257:17-22, 207:4-208:19). Second, as set forth in the Statement of the Case, a careful review of the PSR makes clear that several of the victims lost more money to the scams to which they fell victim than they sent to Moreira. Consequently, the court should have disregarded Agent Rennie's conclusory testimony that—because Moreira had bank accounts—he was the most

important person to the "scheme" (ROA.255:11-256:11). The Appellant was clearly not necessary to the schemes or a "but for cause" because he didn't speak with the victims and because he did not receive a large portion of the frauds perpetrated on at least several of the known victims. A connection to Moreira through a criminal activity in and of itself did not join Moreira's co-conspirators in an organization or activity. In fact, the only necessary conclusion arising from the Appellant's connection to a co-conspirator is that he participated in the crimes committed by the co-conspirator.

### 3. The court mistakenly concluded that the Appellant was the driver of the criminal activity ("the one that made things happen").

The record shows that the Appellant was **not** the driving force behind the romance schemes. Yet the court stated, the Appellant was "the one making this happen." (ROA.313:3-314:19). In fact, Agent Rennie's testimony was that each transaction would start with a co-conspirator reaching out to the Appellant about whether he had an available account for the purpose of receiving money from a victim. (ROA.210:10-13, 207:4-208:19). Accordingly, the conclusion that Appellant "made things happen" is clearly mistaken.

No information showed that Appellant contacted the victims or that he participated in victim selection. (ROA.194:8-18, ROA.257:14-22). If contacted by a co-conspirator, Moreira would negotiate a fee. (ROA.201:25-202:9). Then he would arrange receipt of the funds and transmit value to co-conspirators. (ROA.207:16-209:20). The record suggests that the fee would be somewhere around 11 or 12 percent

of the total. On one occasion, the Appellant told a co-conspirator that if he or she didn't like the fee Appellant charged for his services, they could use somebody else. (ROA.582 ¶ 41). He wrote to a co-conspirator: "And let your guy know say am only doing 11 percent for the 40K. If they decide to use me for the 60k am taking 12 percent if he no want make they use another person." (ROA.582 ¶ 41.) Moreira later told the same person: "Nobody will do what I do for u." (ROA.582 ¶ 41.) These are not the words of someone who was managing or supervising people to make "things happen" or to "direct" a scheme. Perhaps this explains Agent Rennie's testimony that Moreira send money to "individuals that we identified as co-conspirators that had bank accounts overseas that was -- that were directing it." (ROA.254:17-22). Although an 11 to 12 percent fee is not necessarily an insignificant amount, it is much smaller than the total, which is further indication that Moreira did not act as a manager, especially considering that he took most or all of the risk: the transactions were in his legal name and to his accounts.

**4. The Court mistakenly concluded that the Appellant's instructions to co-conspirators regarding how and where to send money was managerial or supervisory conduct and, impliedly, an exercise of authority or control over those co-conspirators.**

The record is clear, when Moreira gave such instructions, he was only facilitating his services to co-conspirators as a conduit for the money, i.e., he gave technical directions to co-conspirators, not orders. In no way can it reasonably be held that the

Appellant directed, controlled, or exercised authority over any participants in the criminal activity.

Cross-examination revealed Agent Rennie based his testimony and conclusions that Appellant managed or supervised other participants in the criminal activity on "instructions" he gave co-conspirators through WhatsApp messages. (ROA.244:20-245:9). According to Rennie, Appellant communicated with co-conspirators regarding "victim-related issues" and "at the very base level, gave them "direction on here's where you send the bank money, here's who you address it to, here's how you send it. That was pretty standard." (ROA.245:3-10).

However, not every instruction given by one criminal to another converts the communicator into a manager and the recipient into a subordinate. There are at least two basic kinds of instructions: the "how to" variety and the "must do" variety. *See* https://www.merriam-webster.com/dictionary/instruction (last visited May 23, 2023) (furnishing several definitions for the term "instruction," including (a) "a direction calling for compliance: ORDER"; and (b) "an outline or manual of technical procedure: DIRECTIONS.")).

As demonstrated above, when Moreira became involved in a swindle, a co-conspirator had already convinced the victim to send money for a fraudulent purpose; co-conspirators contacted him because they needed someone who could receive and transfer the funds. His "instructions" directed activities only insofar as service providers direct their customers regarding how to obtain or use their services. Moreira charged a

fee for his services and, ostensibly, transferred the bulk to his co-conspirators. Neither his how-to instructions nor his conduct demonstrates managerial authority or control.

In fact, a number of videos found on the Appellant's phone show him filming himself retrieving packages and retrieving and counting bundles of money, etc. (ROA.204:3-204:7). These videos make clear that the Appellant was performing tasks he was asked to do on behalf of "clients," who should be viewed as superiors or equal-ranking conspirators. Managers typically do not report their activities in this way to subordinates.

### D. Erroneous Legal Conclusions

To the extent that the trial courts' application of the manager or supervisor enhancement depends on the below findings, the trial court misinterpreted and misapplied the enhancement and otherwise made incorrect legal conclusions. None of them are sufficient to support the necessary findings to support the enhancement.

**1. The court mistakenly concluded that the fact Appellant worked with co-conspirators supports the necessary findings to apply the enhancement.**

The act of working with others does not make the Appellant a manager or supervisor of others. The inference is improper and misapplies the burden of proof.

**2. The court mistakenly concluded that the Appellant being the only person in common among his co-conspirators supports the necessary findings to apply the enhancement.**

The fact that one criminal collaborates separately with two independent criminals who are strangers to one another, even if they run a similar fraud scheme, does not make the first criminal their manager or supervisor. This finding demonstrates an improper inference and shifted the burden of proof to the Appellant.

**3. The court mistakenly concluded that the Appellant's importance in the criminal acts in which he was involved supports the necessary findings to apply the enhancement.**

Exercising an important role or activity does not indicate an exercise of control or authority over another person, nor does it show the size of a continuing or ad hoc criminal organization. This finding does not support the facts necessary to prove manager or supervisor status.

**4. The Court mistakenly concluded that the Appellant's instructions to co-conspirators regarding how and where to send money and troubleshooting of problems delivering or transmitting money supports the necessary findings to apply the enhancement.**

The giving of facilitative, non-obligatory ("how-to" as opposed to "must-do") instructions is not legally sufficient to support a finding of manager or supervisor status because, in and of themselves, they do not show the exercise of authority or control.

**5. The court mistakenly concluded that the Appellant's operation of bank accounts and performance of trade-based money laundering supports the necessary findings to apply the enhancement.**

The fact that the Appellant operated bank accounts and converted victim funds for use in international shipping does not imply that the Appellant managed or

supervised people in his conduct of those activities. This finding is not legally sufficient to support the enhancement and improperly shifted the burden of proof to the Appellant.

### E. The Evidence was Insufficient to Meet the Government's Burden of Proof

The court could not have reasonably found sufficient evidence to find by a preponderance of the evidence that Moreira was a manager or supervisor. Fundamentally, the government did not expressly or specifically allege facts or present evidence sufficient to prove that the Appellant managed or supervised other participants in the alleged conspiracy.

*Manager or Supervisor*

Other than bald, conclusory statements, there was no competent evidence that Moreira was a manager or supervisor. The government failed to plead facts and produce evidence showing that Moreira exercised authority or control over any other participant in his criminal activity. Viewed as a whole, the evidence showed that Moreira's services were sought after by co-conspirators when they had a "need" to receive victim funds. In other words, co-conspirators recruited Moreira, not the other way around.

When contacted by co-conspirators, Moreira negotiated rates. He even invited a co-conspirator to use another launderer if they did not like his rates. When he received money from a victim, he diligently and dutifully videotaped his receipt and counting of

the funds, for the obvious purpose of reporting his conduct. These actions do not demonstrate management or supervision.

The record does not contain any evidence Moreira gave obligatory instructions. There are no allegations of who he supposedly managed or to what end. There is no evidence that he set agendas or determined the modus operandi of any crime. Aside from Agent Rennie's bald, conclusory statements, there is no evidence he organized or managed any romance or other wire fraud scheme. In his management of money receipt and transmission and trade-based money laundering, no evidence showed that Moreira managed a team of any size or even a single individual.

A few co-conspirators may have called Moreira "boss" in text messages (ROA.188 ¶ 41). However, as shown in the government's PowerPoint presentation at sentencing, the text messages more frequently used the term "bro" or "brother." (ROA.Gov't Exhibit No.1, 001014). This certainly shouldn't lead anyone to infer that the Appellant and his co-conspirator were born from the same mother. Further, the language of the texts is not readily or necessarily understood as it appears written in Nigerian Pidgin English[3] and as it likely includes slang and other lingo. It is common knowledge that people often use the word "boss" as an informal exchange that does not refer to someone with superiority in a hierarchy; and it is particularly likely to be

---

[3] A review of the Universal Declaration of Human Rights in Nigerian Pidgin English demonstrates it is quite different from American English and that even familiar words and phrases may have different meanings. It is available at: OHCHR | Universal Declaration of Human Rights - Nigerian Pidgin English.

used that way in an informal communication. As a whole, the record shows that Moreira was *nobody's* boss. Accordingly, the use of the term "boss" in a private text message, should not be considered evidence of a managerial role.

*No evidence established that Moreira was part of a criminal organization of more than 5 people.*

The evidence shows that there were separate scams involving several different victims and different co-conspirators. Further, it shows that Moreira received victim funds in at least one type of fraud that was not a romance scheme, and that there may have been others. (ROA.283:8-284:25). Despite contrary assertions, the thrust of the evidence is that Moreira did not work with or within a single organization; rather, he had contacts with several unrelated co-conspirators. Importantly, the government did not present or allege any evidence regarding which co-conspirators ran which scams against which defendants or how many co-conspirators were involved in each scam. The government's presentation of evidence only showed that each act in which Moreira participated in, involved at least two people: one that interfaced online with the particular victim and Moreira to receive and distribute the money or other value.

## II.    THE DISTRICT COURT MADE A REVERSIBLE FACTUAL ERROR IN DECIDING WHETHER TO APPLY USSG § 2B1.1(b)(2)(d) AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT ITS APPLICATION.

### A. Standard of Review & Burden of Proof

The same standard of review and burden of proof that apply to the above analysis of the manager or supervisor enhancement apply to this determination. This Court

reviews a district court's loss calculations for clear error but reviews *de novo* its method of determining loss and its interpretations of the Guidelines. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). Facts to support sentencing determinations must be proven by a preponderance of the evidence. *United States v. Duhon*, 541 F.3d 391, 395 (5th Cir. 2008).

### B. Application of the Enhancement

The district court found that a loss amount in excess of $3.5 million dollars had been established notwithstanding the Appellant's objection. (ROA.300:7-301:24). The trial court's holding constitutes clear error because the court mistakenly concluded: (1) that the Appellant admitted to a loss amount in excess of 4 million dollars, and (2) that the government had presented sufficient evidence to establish a loss amount in excess of $3.5 million by a preponderance of the evidence.

### C. Error and Insufficiency of the Evidence

#### 1. The Court Incorrectly Concluded that Appellant Admitted to a Loss Amount in Excess of $3,500,000.

The trial court concluded that the Appellant admitted to the loss amount alleged in the FSI, well in excess of $3,500,000. That conclusion is based on Moreira's execution of the Factual Basis and his guilty plea.

The Factual Basis begins with the following statements (ROA.113-115):

"The Defendant, Moses Moreira hereby stipulates and agrees that at all times related to the Indictment herein the following facts were true:

1. That the Defendant Moses Moreira who is entering a plea of guilty is the same person charged in the First Superseding Indictment.

2. That the events and conduct described in the First Superseding Indictment occurred in the Eastern District of Texas and elsewhere."

Pursuant to the Trial Court's understanding, Appellant confessed to the loss amount alleged in the FSI by way of the statement in the Factual Basis that "the events and conduct" described in the FSI "occurred in the Eastern District of Texas and elsewhere."

However, the trial court's interpretation is clearly incorrect. First, the latter statement concerning "events and conduct" confirms that the criminal proceedings have been brought against the correct person. The former statement confirms the proceedings have been brought in a court with jurisdiction over that person. Accordingly, these statements do not support the notion that Appellant agreed to all factual allegations stated in either the Indictment or the FSI. Further confirming this reading, Paragraphs 3 through 12 of the Factual Basis contain more detailed admissions to support the elements of the charges asserted against the Appellant by the government. (ROA.113-114). If paragraph 2 of the Factual Basis constituted an admission of all fact allegations in the FSI, paragraphs 3 through 12 of the Factual Basis would be rendered duplicative and superfluous. Moreover, paragraph 13 contains an express admission of guilt, but that paragraph references only the specific facts set forth

**in the Factual Basis**. (ROA.114). It contains no mention of the facts stated in the FSI—an obstreperous absence.

Accordingly, the trial court's interpretation of paragraph 2 of the Factual Basis as an admission of all material facts stated in the FSI is clearly erroneous. As stated in the Appellant's written objection number 2, the Factual Basis document does contain a specific acknowledgement from the Appellant regarding a fraud involving an amount of $100,000.00—but does not contain any acknowledgement to a higher loss amount. (ROA.456-458).

### 2. The Evidence was Insufficient to Establish the Alleged Loss Amount.

The evidence and testimony did not connect, by a preponderance of the evidence, more than $3.5 million to the charged criminal activity or to relevant conduct. Agent Rennie stated he wasn't qualified to talk about the total loss. (ROA.254:23-255:10). Ms. Williams calculated the total loss amount and testified about her method. (ROA.264:5-270:17).

To categorize amounts as victim losses, Ms. Williams went through the "deposit activity" for each account and checked names against a list of "confirmed" victims. But she also testified that she "just noticed a pattern where there is money coming in mostly from women, from different countries, different states, and there doesn't seem to be a business purpose for those funds. I don't see anything that those women or men received in lieu of the funds, no legitimate business transaction. So for all those

instances, I classified it as victim funds." (ROA.265:18-24). This testimony makes clear that these entries were in addition to the amounts from any list of "confirmed" victims.

Essentially, Ms. Williams testified that she presumed deposits into the reviewed accounts were victim funds. To prepare the list, she reviewed the deposit activity and added (1) amounts from confirmed victims to the list, and (2) money coming from different countries and states if there didn't' "seem to be a business purpose for those funds." But because Ms. Williams testified that she compiled the list only through her review of account deposit activity—it is clear there is no reason she would observe "anything that those women or men received" in exchange for those deposits or a business purpose for the funds. Such a determination would require a more extensive endeavor.

By presuming that all deposits into a Moreira-controlled account consisted of victim funds, the government shifted the burden of proof to the Appellant. This is concerning as the amount of victim losses attributed to the Appellant in the PSR's restitution chart (which contains the same total amount as the alleged victim loss) that corresponds to 12 victims (including victim BF) who filed Victim Impact Statements rises only to $804,996.22.[4] The only other loss amounts specifically connected with a

---

[4] This amount is the sum of the loss amounts from the PSR's restitution chart that correspond to each of the victims in PSR paragraphs 45 through 56 as noted below. (ROA.583-585, 596 ¶ 134).

| Paragraph | Loss Amount |
|-----------|-------------|
| 45 | $152,600.00 |
| 46 | $146,586.22 |
| 47 | $12,000.00 |
| 48 | $56,000.00 |

victim identified at sentencing or in the PSR includes the amount of $580,005.22 connected to victim CR and the amounts linked to JT, TKN, FV1, FV2, and FV3, which are $321,710 in their aggregate. Accordingly, $1,725,711.44 is the highest loss amount supported by specific facts and testimony in the record. Here, it is important to recall Ms. William's supposition that every transfer into an account controlled by the Appellant represented victim funds obtained due to wire fraud or related conduct because there are far more alleged victims that appear on the list than there are victim statements.

## III. THE DISTRICT COURT MADE REVERISBLE LEGAL AND FACTUAL ERRORS IN DECIDING WHETHER TO APPLY § 3A1.1, AND THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPLICATION OF THE ENHANCEMENT.

### A. Standard of Review & Burden of Proof

This Court reviews whether a victim is unusually vulnerable as a factual finding for clear error. *United States v. Jenkins*, 712 F.3d 209, 212 (5th Cir. 2013). Generally, this enhancement is subject to the same standard of review and burden of proof as are other sentencing enhancements. However, an appellant's failure to object to either a PSR or

---

| 49 | $20,000.00 |
| 50 | $84,000.00 |
| 51 | $19,000.00 |
| 52 | $10,000.00 |
| 53 | $75,200.00 |
| 54 | $3,600.00 |
| 55 | $100,000.00 |
| 56 | $145,010.00 |

the sentence, "results in review for plain error." *United States v. Ocana*, 204 F.3d 585, 588 (5th Cir. 2000). "Plain error exists if (1) there is an error, (2) the error is plain, ... (3) the error affect[s] substantial rights and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Gordon*, 838 F.3d 597, 604 (5th Cir. 2016) (alterations in original) (quoting *United States v. Garcia-Carrillo*, 749 F.3d 376, 378 (5th Cir. 2014) (per curiam)).

In this case, Appellant's counsel objected to all of the enhancements challenged herein except for the vulnerable victim enhancement. Notwithstanding, because the court sought to apply the enhancement *sua sponte* and for the due process reasons stated further below in this brief, the Appellant requests that the Court review this issue under the clear error standard and maintains that is should do so.

A plain error exists if (1) there has been "an error that has not been intentionally relinquished or abandoned," (2) which is "clear or obvious," and (3) affects "the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725 (1993)." To satisfy this third condition, the defendant ordinarily must "'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Id.* (quoting *United States* v. *Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)). Once all three conditions have been met, "the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings," which, in a regular case, occurs when there is a failure to correct a plain Guidelines error. *Rosales-Mireles v. United States,* 850 F. 3d 246 (U.S. 2018).

## B. Application of the Enhancement

Under § 3A.1.1(b)(1), a 2-level upward adjustment applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim. USSG § 3A.1.1(b)(1). The application notes state that "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG § 3A.1.1(b)(1) cmt. n. 2.

The determination of "vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly articulate completely," and is certainly "not reducible to a calculation of the victim's age or to a diagnosis of the victim's disease." *United States v. Mejia-Orosco*, 868 F.2d 807, 809 (5th Cir.), *cert. denied*, 492 U.S. 924 (1989). This Court gives "due deference to the district court's determination of vulnerability and of what the defendant knew or should have known in this respect." *United States v. Rocha*, 916 F.2d 219, 244-45 (5th Cir.1990), *cert. denied*, 500 U.S. 934 (1991). When a conspiracy to commit wire fraud is charged, to apply the vulnerable victim enhancement, the government must prove that the particular defendant knew or should have known of a victim's status as a vulnerable victim. *See, e.g., United States v. Allen,* 533 F. App'x 406, 412 (5th Cir. 2013).

To trigger § 3A1.1, a vulnerability must be "unusual" and present in only some victims of that type of crime to ensure that the choice of victim evidences the extra

measure of criminal depravity which § 3A1.1 intends to punish more severely, such as the "armed robbery of a blind, elderly, or physically disabled shopkeeper." *United States v. Moree*, 897 F.2d 1329, 1335-1336 (5th Cir. 1990). "On the other hand, neither a businessman nor a bank should be considered unusually vulnerable to armed robbery merely because the bank robber knows they have cash on hand or may have some breach in their security system." *Id.*, at 1336.

## C. Erroneous Legal and Factual Conclusions

### 1. The court improperly inferred that the women described in the PSR were representative of the scores of alleged victims which the government did not furnish evidence.

Despite the fact that there was no evidence furnished regarding most of the alleged victims as only a small number provided victim impact statements, the district court improperly inferred that the 12 victims addressed in the PSR who gave victim impact statements were representative of the unknown or undescribed persons listed as victims. (ROA.143:2-21).

### 2. The court's inference that elderly or otherwise vulnerable women were targeted because middle-aged, elderly, and otherwise vulnerable women were among the victims constitutes clear error.

Ultimately, the court believed that the enhancement applied because most of the victims were older people. In the court's words:

> "But I think leaving aside anything else, just the fact that these are older people, clearly older people, and we have testimony to that effect, I think it -- we have met the standard of elderly and/or otherwise susceptible to this crime. And so I think this enhancement applies." (ROA.319:17-21).

None of the trial court's stated reasons for applying the vulnerable victim enhancement describe any actions evidencing the targeting of older or elderly people. Rather, the court assumed that elderly victims were targeted because the majority of the known victims, apparently from 15 to 17 of 97 identified potential victims, were older than 55. Additionally, the court's "Statement of Reasons" explaining its sentence contains the statement that, "[t]he Defendant has stipulated and admitted that he and his co-conspirators agreed to defraud unwitting victims, many of whom were elderly, across the United States." Nevertheless, the Appellant never admitted that he and his-conspirators agreed to defraud elderly victims. Such a statement is not found in the Factual Basis, the original indictment, the FSI, or the Guilty Plea.

Importantly, the government never gave any testimony with respect to how elderly people were targeted, and it is wholly unclear how the co-conspirators would or could have targeted widows. For example, there is, no information or allegation that the schemers looked to identify potential targets among identified survivors in obituaries. Moreover, the record indicates that victim CR was male and defrauded through a bitcoin scam—not a romance scheme. Because the victims may reflect a diverse group of people, many of whom may lack an unusual vulnerability, it is by no means a well-grounded logical conclusion that Moreira knew or should have known any specific victim was vulnerable.

Similarly, there is no evidence that Appellant's co-conspirators eschewed contact with or ignored potential victims who were not widows or who were under the age of

65, 55 or any other age. Rather, the PSR makes conclusory statements that the schemers used dating sites as their principle means to find victims and that they searched victim profiles to identify weaknesses. However, it appears the government only presumed what the scammers did to identify victims. The PSR does not contain any co-conspirator statements or testimony and does not reflect their knowledge or use of any biographic data. To date, none of the Appellant's co-conspirators have been charged or indicted. Specific fact allegations mentioned only 2 individuals who found their sham love interest through a dating site. Additionally, as discussed in the Statement of Facts, at least three victims met their love interests through websites that do not appear geared toward dating for elderly people.

### 3. The court improperly inferred that because elderly or otherwise vulnerable women were targeted, the Appellant knew or should have known that his co-conspirators targeted elderly women.

The court's reasons for concluding that Appellant knew or should have known that victims were elderly do not include any specific information but are a bare inference based on the Appellant being involved with crimes in which known victims included middle-aged and elderly women, some of whom were divorced or widowed. Notwithstanding the court's conclusion, the fact that a victim possesses a vulnerability is not sufficient for application of the enhancement. Rather, the accused must have displayed particular depravity by having actual or constructive knowledge of the victim's vulnerability *before* or simultaneously with the commission of a crime. Being single and looking for companionship or romance may be prerequisite to becoming a victim of a

romance scheme, but being single and looking for companionship or romance are not characteristics that make an individual *unusually* vulnerable. Per the United States census, nearly 50% of all American adults are single.[5]

This inference was improper as it shifted the burden of proof to the defendant. The record would support a conclusion that the Appellant knew that some of his co-conspirators may have been involved in romance scams. Nothing, however, shows that he knew or had reason to know of any particular or unusual vulnerability of a victim before he received their funds. This is an impermissible inference upon another impermissible inference. The conclusion simply assumes that vulnerable elderly or lonely women were targeted and then assumes that Moreira knew or had reason to know of the targeting.

### D. Insufficiency of the Evidence.

The evidence was not sufficient to meet the government's burden of proof that appellant knew or should have known that a victim was unusually vulnerable. When asked why "the scheme targeted individuals" that fit the profile of senior women," Agent Rennie said "[t]he investigation would show -- and historically, from other cases, it kind of mirrors the same pattern -- that a lot of times these victims are looking for some companionship, looking for a connection with somebody either because they're single, A; or, B, they've lost a loved one." (ROA.193:3-7) (emphasis added). He

---

[5] https://www.census.gov/newsroom/stories/unmarried-single-americans-week.html

continued "a lot of these victims" are in their "fifties, sixties, seventies" and "have amassed some money that is available for people perpetrating fraud to take." However, on cross-examination, Agent Rennie didn't have or know a count of how many of the victims were elderly, couldn't give a breakdown of specific ages or a definitive answer regarding whether all victims were over the age of 55, wasn't sure how many of the victims were widowed and wouldn't disagree that there were only three widows. (ROA. 256:12-25).

The record shows that there was a diversity of ages and backgrounds among the victims and several co-conspirators. Additionally, there were at least two types of scams. The government did not furnish evidence regarding the age of the victim in the bitcoin scam or any unusual vulnerability. Victim "DS," who gave a victim statement at sentencing, did not seem either particularly elderly or unusually vulnerable—other than as the result of her "30-year marriage" having ended recently. (ROA.324:1-2). She testified about herself as follows, "I am an educated, smart, hard-working, honest, good-hearted person." (ROA.323:23-25). Despite her perceived vulnerability as a recent divorcee, the co-conspirator who interacted with DS did not find her through a dating site. She testified, "[i]t wasn't a dating site you found me, it was on *Words With Friends*." (ROA.324:6-7). As described on its website, Words With Friends is a "free-to-play online multiplayer word game, founded in 2009, where players take turns building words in a crossword-puzzle style manner, similar to other classic board games."

At the time of the sentencing hearing on October 22, 2021, DS was 65. (ROA.324:21). Because the Appellant had been in jail since late 2019, DS could not have been older than 64 at the time of the crime. Neither the PSR nor the testimony at sentencing contain any information regarding how the relevant co-conspirator(s) would or could have targeted DS for her alleged romantic and age-related vulnerabilities on Words with Friends. In any case, the presence of CR and DS among the victimized is evidence that not all of the victims scammed by the Appellant's co-conspirators fit a certain mold or pattern, and neither do the scams or the instruments employed.

Agent Rennie testified that 'most' of the victims were over 55. But the government did not present facts showing that Appellant's co-conspirators did anything specific to target older or elderly individuals or, more importantly, to target *vulnerable* older or elderly individuals. Neither "older" or elderly individuals are vulnerable per se. As a matter of law it is insufficient to equate elderly status with per se vulnerability as enhancing "a defendant's punishment for the exploitation of a vulnerable victim under § 3A.1.1 requires analysis of the victim's personal individual vulnerability." *United States v. Smith*, 930 F.2d 1450 (10th Cir.), *cert. denied*, 502 U.S. 879 (1991) (citing *United States v. Creech*, 913 F.2d 780, 782, (1990)). For this reason, the 11th Circuit found clear error in a case where the only record evidence tending to show vulnerability was that "approximately 55 of the 98 victims were age 65 or older, approximately 28 were age 70 or older, and one victim was disabled." *United States v. Hudson*, 822 F. App'x 888, 890 (11th Cir. 2020) (citing *United States v. Frank*, 247 F.3d 1257, 1259-60) (11th Cir. 2001)).

The record does not even show that most of the known victims were so vulnerable as to substantiate targeting in such a manner that would necessarily impart constructive knowledge to the Appellant (given the limited scope of his role in the swindles). Agent Rennie's testimony stated that the victims were "targeted on social media … communication websites such as Google Chat, OurTime, anywhere that they were online with ability to be digitally contacted." (ROA.192:23-25). None of this indicates anything the co-conspirators did to target elderly individuals or individuals suffering from particular loneliness or mental decline. Other than Agent Rennie's statements based on historical cases that "mirror" a similar pattern and the presence of some older, elderly or otherwise vulnerable women among the victims, there was no evidence Appellant's co-conspirators specifically or exclusively chose vulnerable victims.

The evidence showed only that many of the victims were middle-aged or senior citizens. It does not prove any reason why Moreira knew or should have known of the unusual vulnerabilities of any particular victims. The government had "no information" that Appellant was identifying targets of opportunity" (ROA.257:21-22).

### E. The Errors were not Harmless - A Different Outcome was Probable.

The "systemic function of the selected Guidelines range will affect the sentence[…]" and in most cases errors affect the defendant's substantial rights, even where that error is unpreserved. *Molina-Martinez v. United States*, 578 U.S. 189, 200

(2016). The same is true in this case for this enhancement (and the same is true for the other enhancements).

Although at sentencing and in the "Statement of Reasons," the district court said the sentence would have been the same irrespective of the Guideline calculations (ROA.341 ¶¶ 11-16), remand is appropriate in this case for several reasons. First, the Statement of Reasons does not identify this, or any other enhancement, as irrelevant to the sentence. The court flatly asserted that the 168-month term would be appropriate, independently of any reference to a Guideline range because of the court's view of the charged crimes and victim impact—even if the range were found incorrect. But this claim is difficult to accept, given the district court's attention to each objection raised by the defense. Further, if the court were to weigh the factors in 18 U.S.C. § 3553 using the same incorrect findings on which the court based its application of this enhancement (and the others), the court would simply be replicating reversible errors under another statute. Accordingly, a statement that a sentence would be exactly 168 months irrespective of the Guideline range appears to be non-compliant with 18 U.S.C. § 3553(a)(4) and *United States v. Booker*, 544 U.S. 220 (2005). Those authorities require district courts to consider the Guidelines among the other factors enumerated at 18 U.S.C. § 3553(a).

**IV.   THE APPELLANT SUFFERED FROM A LACK OF DUE PROCESS IN THE CARRYING OUT OF THE CRIMINAL PROCESS AGAINST HIM AND THIS COURT SHOULD ACT TO REMEDY THE DENIAL OF DUE PROCESS.**

The Fifth Circuit has opined that "a heightened burden of proof" may be required by "due process in certain situations." *United States v. Brooks*, 681 F.3d 678, 713 (5th Cir. 2012). Such situations include "… certain cases where a sentencing fact is a 'tail that wags the dog of the substantive offense,' and might arguably require a finding beyond a reasonable doubt." *United States v. Mergerson*, 4 F.3d 337, 344 (5th Cir.1993) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). This Court should require a higher burden of proof to apply the challenged enhancements in this case.

### A. Restricted Access to Counsel and to Discovery due to Protective Order and Covid-19

On January 14, 2020, the government filed an agreed motion for protective order. (ROA.41). The district court approved the provisions of the motion for protective order and issued a protective order on January 15, 2020. (ROA.43). Discovery in this matter was voluminous and should have been thoroughly reviewed with the Appellant, in connection with sentencing at a minimum. (ROA.55). However, visitation between the Appellant and his trial counsel was extremely curtailed—likely as a result of pandemic restrictions—and the Protective Order required in person visitation to review the discovery documents. This is likely what resulted in Appellant's trial counsel filing four motions for continuance. Appellant informed undersigned

counsel that he was never able to see the discovery compiled by the government prior to sentencing. Further, despite attempts to coordinate visitation between the Appellant and undersigned counsel or his staff to review the discovery and to determine whether it may contain "Brady" material, pandemic protocols and other safety restrictions in the facility to which the Appellant was moved in Victorville, California have made doing so practically impossible.

At the heart of this appeal is the issue that the Appellant was a service provider—a money man or "mule." As described by the victim who testified at sentencing - victim: '[t]he fact of the matter is scammers and money mules like you take lives…" continuing that she wished to "thank the FBI and this Court for the arrest and convictions of these scammers and money mules. It means a lot to us victims. I know you can't do anything about the ones that are in West Africa, but you are arresting the ones here on American soil." (ROA.324:7-8, 326:5-9). It is clear that his role was as a "money mule," not as a scammer, nor a manager or supervisor. The testifying victim understood this and that the scammers were unreachable in West Africa. Perhaps this is why to date, to the knowledge of Appellant, not a single alleged co-conspirator has been indicted. Even Agent Rennie recognized that the Appellant's role was not to contact the victims and that his participation in a given fraud scheme would begin only after being contacted by a co-conspirator. Based on his limited role in the scams, application of all of the sentencing enhancements challenged herein require proof that was not presented by the government.

## B. Ineffective Assistance of Counsel

The record demonstrates that Appellant's counsel, Ms. Benson, was unprepared for the sentencing hearing and lacked fundamental knowledge regarding her client's case. As a result, she failed to offer evidence to disprove the government's claims with her objections or at sentencing. For instance, in Appellant's objections to the PSR, which were filed on August 26, 2021, Ms. Benson stated that "a review of Moreira's six accounts" showed an amount of around $2.3 million deposited into the Appellant's accounts. (ROA.458). In contrast, the then-current PSR contained a list showing $4.4 million in losses and the government's forensic accountant testified that she reviewed 19 bank accounts associated with Moreira. (ROA.449 ¶ 132).

This demonstrates either that (1) Appellant's trial counsel was not familiar with the discovery before advising her client regarding his guilty plea on April 1, 2021 or that (2) the government had not completely disclosed to Appellant the documentary evidence it had compiled or prepared. In any case, it is apparent that the Appellant did not have access to the proof against him and, therefore, could not participate meaningfully in the sentencing process.

Additionally, Ms. Benson failed to ask questions on cross-examination that would demonstrate the lack of testimony or evidence to support the government's inclusion of all wires and cash in the victim loss amount. This includes a failure to ask questions regarding entries on the list that are anonymously named, such as "Money Order from Kroger #460," "Children's Medical Center Federal Credit Union,"

"Cashier's Check from Regions Bank," "Drawn on Police and Fire Federal Credit Union, Philadelphia, PA" (ROA.202-204 ¶ 134), but also includes entries that do not correspond to any person that did not submit a Victim Impact Statement. Importantly, Appellant's trial counsel also failed to object to the trial court's application of the vulnerable victim enhancement—despite obvious reasons to object as reviewed above.

The Appellant collaborated with many co-conspirators. As a result, it is relatively easy—although misleading and incorrect—to depict his role in the charged wire fraud schemes as at the top of a pyramid, as stated by Agent Rennie, or at the center of the relevant universe, as in the government's PowerPoint presentation. After all, the government focused only on *his universe* of criminal contacts and conduct. For this reason, access to the proof against him was necessary to a constitutionally fair process, which the Appellant was denied. The Appellant cannot and could not hope to disprove the government's allegations without access to the documentary evidence on which the government's witnesses purportedly based their testimony.

## CONCLUSION

Appellant prays that this Court (a) vacate his sentence and (b) remand for resentencing with an (i) order to the district court to apply an elevated burden of proof in connection with one or more of the enhancements or to (ii) delay resentencing until the Appellant has had the opportunity to review with new counsel all of the non-

privileged documents compiled or prepared by the government in investigating Moreira and in preparation for trial.

SUBMITTED BY:

/s/ Jason B. Freeman
Jason B. Freeman

FREEMAN LAW, PLLC
7011 Main Street
Frisco, Texas 75034
Jason@freemanlaw.com
Tel: 214-984-3410

# CERTIFICATE OF SERVICE

I certify that on May 25, 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users: Anand Varadarajan and Bradley Visosky, Assistant U.S. Attorneys.

/s/ Jason B. Freeman
Jason B. Freeman

# CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 11,411 words.

2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P.

32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Garamond.

/s/ Jason B. Freeman
Jason B. Freeman