# No. 21-40811

# United States Court of Appeals for the Fifth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**MOSES MOREIRA,**

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 4:19-CR-316-1

**BRIEF FOR APPELLEE UNITED STATES OF AMERICA**

Damien M. Diggs
  United States Attorney
  Eastern District of Texas

Terri L. Hagan
  Assistant United States Attorney
  101 E. Park Boulevard, Suite 500
  Plano, Texas 75074
  (972) 509-1201

**ATTORNEYS FOR THE UNITED STATES**

## Statement Regarding Oral Argument

The United States submits that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record. Fed. R. App. P. 34(a)(2)(C).

# Table of Contents

**Page(s)**

Statement Regarding Oral Argument ................................................... i

Table of Authorities ............................................................ iv

Statement of Jurisdiction ................................................. 1

Statement of the Issues ....................................................... 1

    Issue 1: Did the district court reversibly err in determining that Moreira and his coconspirators caused their victims a combined loss of between $3.5 million and $9.5 million? Alternatively, was any error harmless? (Responsive to Moreira Issues III ............... 1

    Issue 2: Did the district court clearly err in applying the manager/supervisor role adjustment? Alternatively, was any error harmless? (Responsive to Moreira Issues I & II) ................ 1

    Issue 3: Did the district court plainly err in applying the vulnerable-victim enhancement? (Responsive to Moreira Issues V & VI) ......................................................... 1

    Issue 4: Did the district court plainly err by failing to hold the government to a higher standard of proof at sentencing? (Responsive to Moreira Issue VII) ................................ 1

Statement of the Case ...................................................... 2

Summary of the Argument ................................................ 11

Argument ..................................................................... 14

    Issue 1: The district court did not err, plainly or otherwise, in determining that Moreira and his coconspirators caused their victims a combined loss of between $3.5 million and $9.5 million.

Alternatively, any error was harmless. (Responsive to Moreira Issues III & IV). ............................................................................ 14

Issue 2: The district court did not clearly err in applying the manager/supervisor role adjustment. Alternatively, any error was harmless. (Responsive to Moreira Issues I & II). ............... 27

Issue 3: The district court did not clearly err in applying a vulnerable-victim enhancement. (Responsive to Moreira Issues V & VI). ....................................................................................... 37

Issue 4: The district court did not plainly err by failing to hold the government to a higher standard of proof at sentencing. (Responsive to Moreira Issue VII). ............................................. 47

Conclusion ................................................................................ 52

Certificate of Service ................................................................ 52

Certificate of Compliance ........................................................ 53

# Table of Authorities

**Federal Cases**                                                                                          **Page(s)**

*Puckett v. United States,*
   556 U.S. 129 (2009) ..................................................................... 15, 38

*Strickland v. Washington,*
   466 U.S. 668 (1984) ......................................................................... 51

*United States v. Abreu,*
   No. 21-60861, 2023 WL 234766 (5th Cir. Jan. 18, 2023) ................. 27

*United States v. Aderinoye,*
   33 F.4th 751 (5th Cir. 2022) ........................................................... 36

*United States v. Ahmed,*
   324 F.3d 368 (5th Cir. 2003) ........................................................... 24

*United States v. Alvarez,*
   764 F. App'x 425 (5th Cir. 2019) ..................................................... 51

*United States v. Biyiklioglu,*
   716 F. App'x 270 (5th Cir. 2017) ..................................................... 43

*United States v. Brantley,*
   537 F.3d 347 (5th Cir. 2008) ........................................................... 45

*United States v. Brooks,*
   681 F.3d 678 (5th Cir. 2012) ...................................................... 48, 50

*United States v. Brown,*
   7 F.3d 1155 (5th Cir. 1993) ............................................................. 42

*United States v. Burgos,*
   137 F.3d 841 (5th Cir. 1998) ........................................................... 43

*United States v. Cabrera,*
    288 F.3d 163 (5th Cir. 2002) ............................................................ 34

*United States v. Carreon,*
    11 F.3d 1225 (5th Cir. 1994) ............................................................ 48

*United States v. Ceballos-Amaya,*
    470 F. App'x. 254 (5th Cir. 2012) .................................................... 35

*United States v. Coe,*
    482 F. App'x 954 (5th Cir. 2012) ..................................................... 44

*United States v. Cooper,*
    274 F.3d 230 (5th Cir. 2001) ............................................................ 33

*United States v. De Nieto,*
    922 F.3d 669 (5th Cir. 2019) ............................................................ 16

*United States v. Delgado,*
    672 F.3d 320 (5th Cir. 2012) .................................................... 30, 32

*United States v. Delgado,*
    747 F. App'x 252 (5th Cir. 2019) ..................................................... 35

*United States v. Dock,*
    426 F.3d 269 (5th Cir. 2005) ............................................................ 43

*United States v. Escobar,*
    866 F.3d 333 (5th Cir. 2017) ............................................................ 14

*United States v. Fisk,*
    233 F. App'x 371 (5th Cir. 2007) ..................................................... 24

*United States v. Hearns,*
    845 F.3d 641 (5th Cir. 2017) ............................................................ 14

*United States v. Hebron,*
   684 F.3d 554 (5th Cir. 2012) ............................................................. 23

*United States v. Hudgens,*
   4 F.4th 352 (5th Cir. 2021) ............................................................... 46

*United States v. Inman,*
   411 F.3d 591 (5th Cir. 2005) ............................................................. 15

*United States v. Isgar,*
   739 F.3d 829 (5th Cir. 2014) ............................................................. 51

*United States v. Islas-Saucedo,*
   903 F.3d 512 (5th Cir. 2018) ............................................................. 45

*United States v. Ismoila,*
   100 F.3d 380 (5th Cir. 1996) ............................................................. 34

*United States v. Jones,*
   475 F.3d 701 (5th Cir. 2007) ............................................................. 16

*United States v. Lopez-Perez,*
   623 F. App'x 223 (5th Cir. 2015) ....................................................... 37

*United States v. Lozano,*
   791 F.3d 535 (5th Cir. 2015) ............................................................. 15

*United States v. Mahmood,*
   820 F.3d 177 (5th Cir. 2016) ............................................................. 14

*United States v. Majors,*
   No. 20-40629, 2021 WL 5095505 (5th Cir. Nov. 2, 2021) ................. 38

*United States v. Mathew,*
   916 F.3d 510 (5th Cir. 2019) ............................................................. 16

*United States v. Maturin,*
  488 F.3d 657 (5th Cir. 2007) ........................................................... 15

*United States v. McGavitt,*
  28 F.4th 571 (5th Cir. 2022) .......................................................... 45

*United States v. Mergerson,*
  4 F.3d 337 (5th Cir. 1993) .............................................................. 50

*United States v. Morrison,*
  713 F.3d 271 (5th Cir. 2013) .......................................................... 17

*United States v. Nava,*
  762 F.3d 451 (5th Cir. 2014) .......................................................... 45

*United States v. Nesmith,*
  866 F.3d 677 (5th Cir. 2017) .......................................................... 15

*United States v. Nowlin,*
  640 F. App'x 337 (5th Cir. 2016) ................................................... 35

*United States v. Ochoa-Gomez,*
  777 F.3d 278 (5th Cir. 2015) ............................................... 27, 28, 29

*United States v. Olano,*
  507 U.S. 725 (1993) ........................................................................ 47

*United States v. Panos,*
  634 F. App'x 123 (5th Cir. 2015) ................................................... 34

*United States v. Patel,*
  485 F. App'x 702 (5th Cir. 2012) ................................................... 43

*United States v. Peterson,*
  977 F.3d 381 (5th Cir. 2020) .......................................................... 16

*United States v. Reuter*,
  463 F.3d 792 (7th Cir. 2006) ........................................................... 48

*United States v. Richardson*,
  676 F.3d 491 (5th Cir. 2012) ...........................................................26

*United States v. Rose*,
  449 F.3d 627 (5th Cir. 2006) ...........................................................32

*United States v. Simpson*,
  741 F.3d 539 (5th Cir. 2014) ...................................................... 16, 50

*United States v. Smith*,
  930 F.2d 1450 (10th Cir. 1991) ...................................................... 40

*United States v. St. John*,
  625 F. App'x 661 (5th Cir. 2015) ...................................................23

*United States v. St. Junius*,
  739 F.3d 193 (5th Cir. 2013) ...........................................................29

*United States v. Staten*,
  466 F.3d 708 (9th Cir. 2006) ...........................................................48

*United States v. Swenson*,
  25 F.4th 309 (5th Cir. 2022) ...........................................................39

*United States v. Tello*,
  9 F.3d 1119 (5th Cir. 1993) ...........................................................25

*United States v. Thomas*,
  384 F. App'x 394 (5th Cir. 2010) ...................................................42

*United States v. Torres-Magana*,
  938 F.3d 213 (5th Cir. 2019) ...........................................................27

*United States v. Tuma,*
  738 F.3d 681 (5th Cir. 2013) .............................................................. 37

*United States v. Umawa Oke Imo,*
  739 F.3d 226 (5th Cir. 2014) ..................................................... 17, 23

*United States v. Valdez,*
  453 F.3d 252 (5th Cir. 2006) .............................................................. 27

*United States v. Ventura,*
  353 F.3d 84 (1st Cir. 2003) ................................................................ 34

*United States v. Villareal-Amarillas,*
  562 F.3d 892 (8th Cir. 2009) .............................................................. 48

*United States v. Warren,*
  986 F.3d 557 (5th Cir. 2021) ..................................................... 29, 30

*United States v. Watson,*
  813 F. App'x 969 (5th Cir. 2020) ....................................................... 36

*United States v. Wilcox,*
  631 F.3d 740 (5th Cir. 2011) ............................................... 37, 39, 42

*Williams v. United States,*
  503 U.S. 193 (1992) ........................................................................... 26

Federal Statutes and Rules

18 U.S.C. § 1343 ..................................................................................... 1

18 U.S.C. § 1349 ..................................................................................... 1

18 U.S.C. § 3742 ..................................................................................... 1

28 U.S.C. § 1291 ..................................................................................... 1

18 U.S.C. § 3553(a) ...................................................................... *passim*

Fed. R. App. P. 32(a)(5) .................................................................. 53

Fed. R. App. P. 32(a)(6) .................................................................. 53

Fed. R. App. P. 32(a)(7)(B) ............................................................ 53

Fed. R. App. P. 32(f) ...................................................................... 53

Fed. R. App. P. 34(a)(2)(C) .............................................................. i

Fed. R. Crim. P. 52(a) .................................................................... 26

U.S.S.G. § 2B1.1 ............................................................................ 16

U.S.S.G. § 2B1.1(a) ........................................................................ 17

U.S.S.G. § 2B1.1(b)(1) .................................................................... 17

U.S.S.G. § 2B1.1(b)(2)(D) ............................................................... 17

U.S.S.G. § 3A1.1 ............................................................................ 39

U.S.S.G. § 3A1.1(b) ........................................................................ 37

U.S.S.G. § 3A1.1(b)(1) ........................................................... passim

U.S.S.G. § 3A1.1(b)(2) .................................................................... 39

U.S.S.G. § 3B1.1 ..................................................................... 28, 29, 35

U.S.S.G. § 3B1.1(a) ........................................................................ 35

U.S.S.G. § 3B1.1(b) ............................................................... 9, 28, 35

U.S.S.G. § 3B1.1(c) ........................................................................ 27

## Statement of Jurisdiction

Moses Moreira pleaded guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and wire fraud, in violation of 18 U.S.C. § 1343. At sentencing, the district court (Jordan, J.) imposed a 168-month within-guideline-range sentence. Moreira timely appeals his sentence. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## Statement of the Issues

Issue 1:  Did the district court reversibly err in determining that Moreira and his coconspirators caused their victims a combined loss of between $3.5 million and $9.5 million? Alternatively, was any error harmless? (Responsive to Moreira Issues III & IV)

Issue 2: Did the district court clearly err in applying the manager/supervisor role adjustment? Alternatively, was any error harmless? (Responsive to Moreira Issues I & II)

Issue 3: Did the district court plainly err in applying the vulnerable-victim enhancement? (Responsive to Moreira Issues V & VI)

Issue 4: Did the district court plainly err by failing to hold the government to a higher standard of proof at sentencing? (Responsive to

Moreira Issue VII)

## Statement of the Case

A grand jury in the Eastern District of Texas charged Moreira, an illegal alien from Nigeria, ROA.223-26, 574, with conspiracy to commit wire fraud and wire fraud resulting in a loss of about $4 million, ROA.89-99. He pleaded guilty to both charges without a plea agreement. ROA.575 (¶ 6). At sentencing, the government called two witnesses whose testimony was based on analyses of publicly available information: bank records, Moreira's cell phone, victim interviews, and reports from law-enforcement agencies. ROA.190-91, 260-61. One witness, a lead case agent, used a PowerPoint presentation to illustrate, *inter alia*, the fraudulent scheme, including Moreira's role in it; the flow of funds obtained by fraud; messages between Moreira and his coconspirators; and the loss caused to fraud victims. ROA.344-86 (Govt. Exhibit 1). The other witness, a certified public accountant (CPA) and certified fraud examiner, summarized her findings after reviewing 19 bank accounts Moreira established and managed. ROA.259-62. She presented several summary charts, including a chart identifying each victim by name and the amount each had lost, concluding that victims

suffered a collective loss in excess of $4 million. ROA.235-36, 256, 263-68, 276-79, 393-94 (Govt. Exhibit 6).

## A.    The "romance scheme"

Moreira was part of a romance scheme that targeted "senior women, many of them that were widowed or single," using social media, "such as Google Chat, OurTime, anywhere that they were online with ability to be digitally contacted." ROA.192; *see also* ROA.324, 578 (¶ 20), 579 (¶ 28), 581 (¶ 38), 582 (¶ 41). The scammers were able to take advantage of these victims, *first*, because "a lot of times [they] are looking for some companionship … either because they're single, A; or, B, they've lost a loved one." ROA.193. *Second*, people over fifty have usually "amassed some money that is available for people perpetrating a fraud to take." ROA.193. And *third*, these victims tend to be less aware of the risks and pitfalls of online communication than people in their twenties. ROA.193.

Indeed, as the district court recognized, Moreira admitted that "he and his coconspirators agreed to defraud unwitting victims, many of whom were elderly, across the United States." ROA.337. Moreira and his coconspirators created "false identities and false stories to befriend

3

and romance victims." ROA.113, *see also* ROA.575-76 (¶ 9). They gained

their victims' trust through social grooming and then persuaded the

victims to send them money under false pretenses, concocting some

"emergency" that the money would be used for.[1] ROA.113, 222, 575-76

(¶ 9). The victims believed they were sending money to "someone they

care[d] about[.]" ROA.222. And Moreira himself sometimes provided the

fictional stories that his coconspirators told victims to cause them to

send money. ROA.195.

## B. Moreira established 19 bank accounts, used an alias, and created three sham companies to execute the fraud scheme and then directed the receipt and distribution of fraud proceeds.

It was crucial to the fraud scheme's success that victims were able

to send money to banks in the United States. ROA.200-01, 222. That's

because victims, "even the most unsophisticated", would likely be

suspicious if they were asked to send their money to Nigeria. ROA.222-

23. Moreover, banks and bank regulators were likely to become

suspicious of money sent to Nigeria from those who were victimized due

to anti-laundering efforts. ROA.223. Accordingly, Moreira established

---

[1] For example, one victim believed that "Thomas" was a contractor on an oil rig who was being held responsible for 35 percent of the damage caused by an explosion on the oil rig. ROA.581 (¶ 38).

and operated 19 bank accounts at 15 different banks in the United
States to perpetuate the fraud scheme. ROA.193-94, 261-64, 387. Over
$5 million flowed into those accounts, with more than $4.4 million
coming from victims of the scheme. ROA.287, 388, 390.

To divert suspicion, Moreira opened the bank accounts in the
names of sham businesses he created (*i.e.*, Excel Services Limited,
MM&M Logistics, and Volane Executive Services and Auto). ROA.196-
97, 348 (assumed name records). Similarly, he also used an alias, "Mark
Jacob", and his neighbor's address as the destination for tens of
thousands of dollars in cash that fraud victims sent. ROA.198-99, 228-
29, 356 (videos of Moreira counting cash from victims). Moreira then
picked up the packages there or intercepted them before they were
delivered. ROA.198-200, 228, 350-53 (video of neighbors asking Moreira
who is Mark Jacob and photos of FedEx packages).

Not only was Moreira crucial to the scheme, but he also directed it
because he controlled the money, providing "bank accounts [to]
facilitate the movement of money through other financial accounts in
the United States and outside the United States." ROA.255-56, *see also*
ROA.210-11, 237-38, 270-71. Moreira's cell phone revealed that he

"directed his co-conspirators to have the victims send money to"

Moreira. ROA.194, 244-45. He gave coconspirators instructions that

they passed on to victims about "where the money should be sent, and

the form and fashion, how it should be sent." ROA.194. Moreira

provided

> [t]he details of the bank accounts; the manner to which it
> should be mailed, should it be Fed-Ex'd, should it be sent via
> U.S. mail, UPS; and to what accounts it should be sent to; or
> to what attention the cashier's checks or wire transfers --
> what names they should be in and right down to the
> minutiae of the details that are given on a wire transfer;
> what the co-conspirators should tell the victim the wire
> transfer is for.

ROA.195.

Moreira used an end-to-end messaging platform, WhatsApp, to

communicate with at least 32 different coconspirators through

encrypted messages. ROA.201, 244-45, 354 (Govt. Exhibit 1). The

communications concerned: wiring funds; opening bank accounts;

communicating with victims; shipments of cash, checks, and other

forms of money; alias names to use in communicating with victims;

addresses to use; the timing of deliveries; mail carriers to use; paying

Nigerian actors; and the percentage of the funds Moreira would keep for

himself. ROA.201-02, 354 (Govt. Exhibit 1).

## C.    Moreira laundered and spent the fraud proceeds.

Upon receipt, Moreira would transfer the funds to his coconspirators, spend a portion to make luxury purchases, and engage in "trade-based money laundering." The CPA who examined the bank accounts identified almost $300,000 Moreira transferred to his coconspirators. ROA.236-37, 254, 268, 277, 390 (Govt. Exhibit 5A). Moreira's luxury purchases included $40,000 cash he received from a victim that he used as a down payment on a Mercedes Benz SUV. ROA.231-34, 372-76. Forty-thousand dollars wasn't enough to pay for the SUV, so he used false employment information to take out a loan for the balance. ROA.231-34, 374-76. He had two additional cars, an Infinity and a Jaguar. ROA.235, 386. Moreira was also fond of prostitutes and used victim funds to pay for their services and to buy a least one of them a gift, Versace shoes costing just under $1,000 with shipping. ROA.234-35, 381 (photos). He also used victim funds to buy himself several watches, electronic devices, clothes, and shoes and to eat in "fancy restaurants" and take trips. ROA.234-35, 382-85 (photos), 390-92 (summary charts).

And Moreira used about 50 percent of the scammed funds to

engage in trade-based money laundering to circumvent the "very strict anti-money laundering" restrictions banks have in place. ROA.208, 211-13, 222-23, 272-73, 391. This involved Moreira buying "salvaged vehicles" from salvage companies in Dallas for pennies on the dollar and shipping them overseas. ROA.212, 252-53, 273. He used victim funds to both buy the cars and to ship them. ROA.195, 212-13, 231, 390-92 (Govt. Exhibit 5A). Once the cars arrived in Nigeria, they were liquidated. ROA.211-13.

## D.    Moreira knew that he was dealing with victim money.

One of Moreira's coconspirators sent Moreira an audio recording of his conversation with a victim. ROA.218-19, 360-61. The victim, a female, can be heard pleading with the fraudster she knew as "Chris" to return her money. ROA.361.[2] Agents found the audio clip on Moreira's cell phone. ROA.218-21. The audio clip and text messages (also found on his cell phone) make clear that Moreira's coconspirators were defrauding victims via the romance scheme. ROA.218-21, 360-62 (audio clip and text messages).

---

[2] The government invites the Court to listen to the audio clips that the district court heard at sentencing. They were admitted into evidence as part of Govt. Exhibit 1. ROA.350, 356, 361, 370, 372.

**E.    Moreira pleaded guilty and the court-imposed a within-guideline-range sentence.**

In April 2021, Moreira pleaded guilty to a first superseding indictment before a magistrate judge without a plea agreement. ROA.575 (¶ 6). Later, the district court accepted Moreira's plea and found him guilty. ROA.575 (¶ 7).

The United States Probation Office prepared a presentence investigation report (PSR), Moreira filed objections to it, and the government filed a response to Moreira's objections. ROA.395-423, 456-63, 653-56. Relevant to this appeal, Moreira objected to the PSR's loss calculation and to application of the three-level manager or supervisor adjustment under U.S.S.G. § 3B1.1(b). ROA.457-58, 460-61. The probation office agreed with the government that the total loss of funds was correctly calculated, and that the role adjustment applied. ROA.601-03.

At sentencing, the district court adopted the PSR with one pertinent exception, that is, it *sua sponte* determined that a two-level upward enhancement applied under U.S.S.G. § 3A1.1(b)(1) because vulnerable victims were victimized by the crimes. ROA.321. It thus found that Moreira's total offense level was 33, which together with his

criminal history category of I produced a guideline range of imprisonment of 135-168 months. ROA.321-22. The court's finding was based not only on the information in the PSR but also on the evidence the government presented at sentencing. ROA.321-22.

The court then considered 12 written victim impact statements. ROA.583-85 (¶¶ 44-56 summarized). It also heard testimony from one of the victims who identified herself as D.S., a 65-year-old woman. ROA.322-26. D.S. explained that Moreira victimized her "at the most vulnerable time of my life." ROA.324-25. You see, her "30-year marriage [had] ended" and she thought she "found companionship" with a man she met on *Words with Friends*. ROA.324-25. She trusted the scammer, who then caused her to "suffer significantly, emotionally, and financially." ROA.324. She worried about paying her bills and buying groceries. ROA.321. Indeed, without the support of a "not-for-profit romance scammers support group", D.S. would have committed suicide. ROA.324. D.S. sent Volane Executive Services and Auto almost $200,000, which was "all [she] had." ROA.324-25. As a consequence, D.S. will "never be able to fully retire", can "never restore what [Moreira] stole" from her, and was "fearful and worried about [her]

security." ROA.325.

Next, the court heard argument from counsel and Moreira's allocution. ROA.326-33. In pronouncing Moreira's sentence, "a total term of 168 months", the district court referenced the statutory sentencing factors and the advisory guidelines. ROA.333-34. The court also provided explicit reasons for its decision and pointed out that Moreira's sentence "reflects the nature and circumstances of the instant offense", Moreira's history and characteristics "and the risk he presents to the public of committing similar crimes in the future." ROA.337-41. Lastly, the court said that under the factors set forth in § 3553(a) it would have imposed the same sentence even if it erred in calculating Moreira's advisory guideline range. ROA.341.

## Summary of the Argument

The district court's loss estimate was neither plainly, nor clearly erroneous. The court reasonably relied on information in the PSR and evidence presented at sentencing. That information revealed that Moreira and his coconspirators generated a loss of over $4 million. Moreira properly received an 18-level increase because the loss exceeded $3.5 million. The loss calculation was based on adding losses

suffered by both confirmed and unconfirmed victims of the pervasive fraud scheme and the name of each victim included was provided to Moreira and the court. Unconfirmed victims were included because the pattern of deposits from them fit the pattern of deposits from confirmed victims. The evidence established the loss calculation by a preponderance, and Moreira did not rebut the government's evidence on this score.

The district court properly applied the three-level adjustment based on Moreira's role as a manager or supervisor of criminal activity involving five or more participants or that was otherwise extensive. A preponderance of the evidence demonstrated that Moreira exercised control of his coconspirators and exercised management responsibility over the fraud proceeds. The district court's role-adjustment finding was not clearly erroneous. Moreover, any error was harmless because the district court would have imposed the same sentence, for the same reasons, without it.

The district court correctly applied the vulnerable-victim enhancement. Recently widowed and in her 80s, Marylin was vulnerable. Likewise, recently divorced and in her 60s, D.S. was

vulnerable. And recently divorced Maryann was emotionally vulnerable. The court rightly found as much. The record shows that Moreira knew or should have known that elderly and unusually vulnerable victims were duped. Under U.S.S.G. § 3A1.1(b)(1), that ends the inquiry. It doesn't matter whether the conspirators "targeted" victims based on their vulnerability, because this Court does not require targeting. It also doesn't matter how many victims were vulnerable. And while the record demonstrates that the scheme tricked a "large number" of vulnerable victims, it would have been sufficient if only one was involved. In any event, Moreira does not show that any error prejudiced his substantial rights and the record shows that the district court would have imposed the same sentence in light of the devastating harm to the victims and of other pertinent statutory factors even if it erroneously applied the adjustment.

Lastly, the court did not plainly err by requiring proof of guideline adjustments by the usual preponderance-of-the-evidence standard. Nothing about the circumstances of this case violated Moreira's due process rights. His counsel fully examined all of his bank account records and presumably other evidence before sentencing and

imposition of a heightened burden for factual determinations at
sentencing was not required.

## Argument

**Issue 1:  The district court did not err, plainly or
otherwise, in determining that Moreira and his
coconspirators caused their victims a combined loss
of between $3.5 million and $9.5 million. Alternatively,
any error was harmless. (Responsive to Moreira
Issues III & IV)**

## Standard of Review

Generally, this Court reviews the district court's application of the
Sentencing Guidelines de novo and its factual findings, such as, its loss
calculation for clear error. *United States v. Mahmood*, 820 F.3d 177, 192
(5th Cir. 2016). But where a defendant challenges his sentence on
grounds different than those he raised at sentencing; his new
arguments are reviewed for plain error only. *United States v. Escobar*,
866 F.3d 333, 338 (5th Cir. 2017); *United States v. Hearns*, 845 F.3d
641, 648 (5th Cir. 2017).

Moreira did not raise in the district court either of the challenges
to the court's loss calculation he asserts here. *Compare* Moreira Br. 30-
34 *with* ROA.295-301, 457-58 (modified at sentencing). At sentencing he
argued that losses sustained by two victims included in the

14

government's loss calculation should not be included because they were
(arguably) not part of the romance fraud scheme. ROA.295-301. On
appeal, he argues that the court: (1) incorrectly concluded that he
admitted to a loss exceeding $3.5 million; and (2) incorrectly included
losses sustained by "unconfirmed" victims. Moreira Br. 30-31. He
concludes that the evidence was thus insufficient to support the court's
finding. Moreira Br. 32-34.

Because Moreira made a materially different argument in the
district court, *infra,* his argument is reviewable only for plain error. *See
United States v. Lozano*, 791 F.3d 535, 537 (5th Cir. 2015); *United
States v. Nesmith*, 866 F.3d 677, 679 (5th Cir. 2017). Consequently, the
Court must determine whether there was error, if it was plain or
obvious, and if it affected Moreira's substantial rights. *United States v.
Maturin*, 488 F.3d 657, 660 (5th Cir. 2007); *Puckett v. United States*,
556 U.S. 129, 135 (2009). If the Court concludes that Moreira has met
all three requirements, "[it] will exercise [its] discretion to correct the
error if it seriously affects the fairness, integrity or public reputation of
judicial proceedings." *United States v. Inman*, 411 F.3d 591, 595 (5th
Cir. 2005) (internal quotation and brackets omitted).

In all events, this Court gives the district court "wide latitude" to determine the loss amount. *United States v. De Nieto*, 922 F.3d 669, 674-75 (5th Cir. 2019). And the loss "need not be determined with precision" or "absolute certainty." *Id*. at 675. Rather, "the guidelines require 'only ... a 'reasonable estimate of the loss'", *id*. (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)), "based on available information", *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).

When a district court calculates the loss amount, it may rely on "any information which bears sufficient indicia of reliability to support its probable accuracy." *United States v. Peterson*, 977 F.3d 381, 396 (5th Cir. 2020) (internal quotation omitted). That includes "information in the PSR ... so long as that information bears some indicia of reliability." *De Nieto*, 922 F.3d at 675 (internal quotation omitted). A defendant who challenges a loss estimate "bears the burden of presenting rebuttal evidence to demonstrate that the information" on which it is based is "inaccurate or materially untrue." *See id*. The loss amount "need only be found by a preponderance of the evidence." *United States v. Simpson*, 741 F.3d 539, 556 (5th Cir. 2014); *United States v. Mathew*, 916 F.3d 510, 520 (5th Cir. 2019).

And when reviewing a loss calculation for clear error, the Court will not find clear error if the district court's finding is "plausible in light of the record as a whole." *United States v. Umawa Oke Imo*, 739 F.3d 226, 240 (5th Cir. 2014) (quotation omitted). In other words, like other factual findings, a court's loss-amount calculation is "clearly erroneous if, based on the record as a whole, [this Court is] left with the definite and firm conviction that a mistake has been committed." *United States v. Morrison*, 713 F.3d 271, 279 (5th Cir. 2013) (internal quotation omitted).

## Discussion

Fraud offenses with a statutory-maximum punishment of 20 years have an advisory sentencing guideline base of 7. U.S.S.G. § 2B1.1(a); ROA.586-88 (¶¶ 63, 74). Section 2B1.1(b)(1) calls for an offense-level increase based on the financial loss caused by the defendant's fraud. Where the loss is determined to be $3.5 million but less than $9.5 million the guidelines instruct to add 18 levels. U.S.S.G. § 2B1.1(b)(2)(D); ROA.587-88 (¶¶ 65, 75). In this case, the PSR concluded that the loss was within that range. The calculation was based on information provided to the probation officer by the "Assistant United

States Attorney (AUSA), Federal Bureau of Investigation (FBI), the Treasury Inspector General for Tax Administration (TIGTA), and through direct communication with the case agent." ROA.575 (¶ 8). The court could rely on the information in the PSR.

At sentencing the district court's finding that the loss was over $3.5 million was not based on the PSR alone. Special Agent Jason Rennie established that fraudulently derived funds were deposited first into one of 19 of Moreira's bank accounts (per Moreira's instructions). ROA.194-95. Moreira had no legitimate income and the other money deposited in his accounts came from his coconspirators. ROA.233-34. He also established that it was sometimes clear who sent Moreira cash, and the source of wire transfers and cashier's checks were obvious. ROA.204-07 (Moreira took videos of himself opening envelopes of cash and counting the cash inside and text messages revealed who sent Moreira funds), ROA.246-47.

Over the course of the scheme, various banks got suspicious when their customers sent money in ways that were out of the ordinary and they "recalled" the funds from Moreira's bank account. ROA.213-14. Plus, the identification of some of Moreira's victims was frustrated by

their embarrassment, shame, and guilt. *See* ROA.236. The scheme was pervasive; it affected more than 90 victims. ROA.235.

Once Moreira's bank accounts were identified, CPA and forensic accountant Pamela Williams analyzed them. ROA.259-62. After verifying that Moreira's name was on each of the bank accounts, she listed them on a spreadsheet. ROA.261-63, 387 (Govt. Exhibit 2). Williams then analyzed every deposit in each of the 19 accounts, determining the source and categorizing them. ROA.263, 388 (Govt. Exhibit 3). The grand total of all deposits made in the 19 accounts was $5,291,552.22. ROA.388 (Govt. Exhibit 3). Victims provided most of those funds. ROA.264-65, 388. They sent Moreira about $4,462,505.15. ROA.265, 388.

Williams first identified which funds came from victims based on the FBI's confirmation of actual victims. ROA.265. As she did this, she noticed a pattern "where there is money coming in mostly from women, from different countries, different states, and there doesn't seem to be a business purpose for those funds." ROA.265. When deposits fit that pattern, she looked for a legitimate business purpose and when she couldn't find one, she classified the deposits as being victim funds.

ROA.265. The victim funds were "bank wires, a few money orders, and then a lot of cashier's checks" making it simple for Williams to compile another chart totaling the funds from each victim by name. *See* ROA.264-65, 277-78, 393-94 (Govt. Exhibit 6).

After hearing the government's evidence, Moreira's counsel modified her written objection to the loss amount calculation. *Compare* ROA.295-301 (characterizing oral objection as "a little different than … [the]written objection" and implicitly recognizing that, since filing the written one, she had reviewed "all the bank accounts"), *with* ROA.457-58 (stating that she had only reviewed six accounts). She objected to the inclusion of the losses of $580,000 (Cameron Ryan) because Ryan contributed the funds as part of a Bitcoin scam arguing that such scam was not relevant conduct. ROA.295. And she also objected to including approximately $64,000 from the Stolp Living Trust because she could not find anything substantiating the loss in her review of "all the records." ROA.296. The government argued that both amounts should be included (those from Ryan were relevant conduct) but recognized that excluding both amounts would not reduce the loss to less than $3.5 million and so would not affect the guideline-level calculation. ROA.297-

99.

When argument on the loss-amount calculation was done, the court overruled the objection. ROA.299-301. First, the court determined that Moreira had effectively admitted the loss amount because he had admitted in the factual basis he signed that "the events and conduct described in the First Superseding Indictment occurred in the Eastern District of Texas", ROA.113, and the indictment alleged that the loss amount was "approximately $4,000,000." ROA.94, 300. Though Moreira didn't object to the court's interpretation below, ROA.300-02, he does so now, claiming that the quoted portion of the factual basis above was not an admission of all the factual allegations in the indictment. Moreira Br. 30-32. The government agrees that the language the district court relied on from the factual basis was more geared toward an admission that venue was proper in the Eastern District of Texas rather than an admission of every jot and tittle of the indictment.

No matter; the district court also overruled Moreira's objection on the grounds that excluding the amounts in question (totaling about $644,000) did not lead to a loss of less than $3.5 million. ROA.300. The court's calculation was correct because the loss amount would still

exceed $3.5 million. *See* ROA.394 ($4,462,505.15 less $644,000 equals $3,818,505.15).

For the first time, Moreira now takes issue with the district court's inclusion of the losses of confirmed victims with those of unconfirmed ones. Moreira Br. 32-34. He then applies his own (deficient) formula to conclude that the greatest loss supported by the record is $1,725,711.44. *See* Moreira Br. 33-34 (adding only the losses identified in the PSR from Victim Impact Statements to losses suffered by victims CR, JT, TKN, FV1, FV2, & FV3). He justifies his process on the grounds that the court's loss determination involves "far more alleged victims" than those who submitted victim statements. Moreira Br. 34. Moreira is wrong to exclude other losses.

For starters, he ignores the glaring explanation that there were fewer victim statements than victims. Not every victim provided a statement, nor should they be expected to. As Agent Rennie explained, even when the FBI had "good information, knowledge that [victims] provided money, a lot of times they're reluctant to come forward because they're embarrassed, they don't want to relive it, or their family doesn't know, they don't want their family to know." ROA.236. Such is

the nature of Moreira's crime. Indeed, the district court recognized that "a theme running through the victim impact statements" it received "is … the tremendous embarrassment, shame, and anguish[.]" ROA.340. Further, the victims Moreira includes are not necessarily the only confirmed victims; CPA Williams didn't say those victims were the only confirmed ones. *See* ROA.265, 267, 393-94.

Moreover, the district court did not err, plainly, clearly, or otherwise in determining that the loss was over $3.5 million. That's because, as demonstrated above, the available evidence established that a reasonable estimate of the loss was more than $4 million. Moreover, giving the district court's finding the deference it deserves, the loss amount it found was plausible in light of the record. *See United States v. Imo*, 739 F.3d 226, 240 (5th Cir. 2014). The method that the CPA used to identify victims of the romance fraud scheme was wholly reasonable and reliable. Especially so in light of the pervasiveness of the fraud conspiracy affecting more than 90 victims. *See United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015) (per curiam) (internal quotation marks omitted) (citing *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) (when a fraud scheme is so pervasive that it isn't

"reasonably practical" to separate legitimate conduct from fraudulent conduct, the burden shifts to the defendant to rebut the loss calculation). The decision to include losses suffered by unconfirmed victims wasn't speculative; it was realistic. It was based on the rational determination that they were, in fact, victims because they fit the same pattern as confirmed ones.

Here, the evidence was sufficient to prove by a preponderance that the loss caused by Moreira's conspiracy to commit the romance fraud scheme exceeded $3.5 million. Thus, it was incumbent on Moreira to rebut the government's proof. *See United States v. Fisk*, 233 F. App'x 371, 373 (5th Cir. 2007) (unpublished) (loss calculation included insurance claims that were partially fraudulent and burden shifted to defendant to show the portions of each claim that were legitimate). He didn't.

Finally, any error did not affect Moreira's substantial rights because it was harmless. An error in the application of the sentencing guidelines can be disregarded as harmless if it "did not affect the district court's selection of the sentence imposed." *United States v. Ahmed*, 324 F.3d 368, 374 (5th Cir. 2003) (quotation omitted). The

proponent of the sentence, the government in this case, bears the burden to "persuade the court of appeals that the district court would have imposed the same sentence absent the erroneous factor." *United States v. Tello*, 9 F.3d 1119, 1129 (5th Cir. 1993) (quotation, emphasis, and brackets omitted).

In this case, the district court twice expressly stated that it would impose the same sentence even if it incorrectly calculated "the guideline range, in light of the factors set forth in Title 18 U.S.C. § 3553(a)." ROA.341, 615. For example, in its written statement of reasons, the court noted that "It is hard to overstate the despicable nature of Mr. Moreira's actions and the incalculable, devastating harm he has inflicted on so many victims." ROA.615. As it pointed out, the victim impact statements "tell a tragic tale of the many lives ruined and destroyed by the cruel deception and fraud Moreira and his co-conspirators practiced on their unwitting victims, many of whom are of advanced years and who have now lost their life savings." ROA.615.

The court appropriately considered the impact on Moreira's victims as circumstances of the offense and determined that the 168-month sentence reflects the "nature and circumstances" of the crime

and the risk he presents to the public. ROA.615 (it also considered other factors under § 3553(a) as discussed in Issue 3, *infra*). This Court has repeatedly held that, it will not vacate and remand for resentencing, when an error in calculating the advisory guideline range "'did not affect the district court's selection of the sentence imposed.'" *See, e.g., United States v. Richardson*, 676 F.3d 491, 511 (5th Cir. 2012) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992); citing Fed. R. Crim. P. 52(a)). Because of the devastating impact of Moreira's actions on his victims, irrespective of the amount of money each one lost, and the risk that he would inflict further harm on others, and because the court determined that the sentence "provides just punishment, adequately sanctions the Defendant's criminal conduct, and promotes respect for the law", ROA.615, the record convincingly demonstrates that the district court would have imposed the same sentence, for the same reasons it explained at sentencing, irrespective of the guidelines. Thus, any error in the loss amount calculation was harmless. Nor did it affect Moreira's substantial rights. His argument fails under either standard of review.

**Issue 2: The district court did not clearly err in applying the manager/supervisor role adjustment. Alternatively, any error was harmless. (Responsive to Moreira Issues I & II)**

## Standard of Review

"Whether a defendant exercised an aggravating role as an organizer, leader, manager, or supervisor for purposes of an adjustment under U.S.S.G. § 3B1.1(c) is a finding of fact reviewed for clear error." *United States v. Abreu*, No. 21-60861, 2023 WL 234766, at *2 (5th Cir. Jan. 18, 2023) (quoting *United States v. Ochoa-Gomez*, 777 F.3d 278, 281 (5th Cir. 2015)). "Under that deferential clear-error standard, a sentencing court's factual findings will be upheld if they are plausible in light of the record as a whole, and they will be deemed clearly erroneous only if a review of all the evidence leaves this court with the definite and firm conviction that a mistake has been committed." *United States v. Torres-Magana*, 938 F.3d 213, 216 (5th Cir. 2019) (internal quotation omitted). A district court may base its factual findings on "any information that has sufficient indicia of reliability to support its probable accuracy," including hearsay. *United States v. Valdez*, 453 F.3d 252, 267 (5th Cir. 2006) (cleaned up).

## Discussion

The guidelines allow a district court to increase a defendant's offense level where he played an aggravating role in the offense of conviction. U.S.S.G. § 3B1.1. Relevant to this case, a court may impose a three-level enhancement if the defendant "was a manager or supervisor" and the "criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).

In Moreira's view, the district court made erroneous factual and legal conclusions and the evidence didn't support application of the manager/supervisor role adjustment because he didn't personally contact the victims or select them, and the instructions he gave can be characterized as "how to" as opposed to "must do". Moreira Br. 20-29. He devotes ten pages to what he calls "error", essentially arguing that he didn't have sufficient control over his coconspirators, yet he fails to recognize that a court may apply the adjustment not only where a defendant exercises control over his coconspirators but also where he "exercised management responsibility over the property, assets, or activities of a criminal organization." *Ochoa-Gomez*, 777 F.3d at 282 (even without control over another participant). He also argues that the

existence of other fraud schemes precludes the district court's finding.

Moreira Br. 20.

**A.  Moreira directed other participants in the offense *and* exercised management responsibility over the property, assets, or activities of a criminal organization.**

"Application Note 4 lists seven factors to consider: '(1) the exercise of decision making authority,' (2) 'the nature of participation in the commission of the offense,' (3) 'the recruitment of accomplices,' (4) 'the claimed right to a larger share of the fruits of the crime,' (5) 'the degree of participation in planning or organizing the offense,' (6) 'the nature and scope of the illegal activity,' and (7) 'the degree of control and authority exercised over others.'" *United States v. Warren*, 986 F.3d 557, 568 (5th Cir. 2021) (quoting U.S.S.G § 3B1.1 cmt.4).

Relying in part on Application Note 2,[3] this Court has also "upheld offense-level increases under § 3B1.1 based solely on management of property, assets or activities." *Id*. at 569, n.44 (upholding the continuation of the practice under the "rule of orderliness" and citing

---

[3] Application Note 2 allows the court to enhance a sentence if the defendant "did not … manage, or supervise another participant, but … nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1 cmt.2.

*Ochoa-Gomez*, 777 F.3d at 283; *United States v. St. Junius*, 739 F.3d

193, 208-09 (5th Cir. 2013); *United States v. Delgado*, 672 F.3d 320, 345

(5th Cir. 2012) (en banc)). Although the panel in *Warren* expressed

disagreement with applying the role adjustment when the defendant

only managed the property or assets of the criminal organization, it

affirmed the district court's decision to do so. *See id.* In this case,

Moreira's role in the fraud scheme fits the criteria in both application

notes because he had a large role in planning and organizing the

offense, sufficiently controlled another participant, *and* managed the

assets and property of the criminal organization. The district court did

not clearly err in applying the adjustment.

To begin, the record reveals that Moreira had a large role in

"planning and organizing" as contemplated by Application Note 4. He

"set up the bank accounts in the United States and he received the

money from the victims." ROA.549 (¶ 71). He established not only 19

bank accounts to receive the fraud funds, but also created three sham

businesses and used an alias to perpetuate the fraud. ROA.192-200. As

discussed next, without him, the "scheme does not operate". ROA.210.

He also had control over his coconspirators. Because his

participation in the scheme was crucial to its success, his directions were more of a "must-do" than a "how-to" nature. *Contra* Moreira Br. 24. Indeed, using encrypted messaging, Moreira directed his unindicted coconspirators on how to get scammed funds to him: where (which bank account or physical address); how (FedEx, U.S. mail, or UPS); and in what form (cash, wire transfer, or cashier's check) to send fraud funds. ROA.194-95, 201-03, 236-38, 247-52, 346-47 (summary charts), 354-57 (summary charts), 603. At his direction, his coconspirators provided false stories to befriend and romance victims and to cause them to part with their money under false pretenses. ROA.195 (Moreira instructed them what to "tell the victim the wire transfer is for"). And he instructed his coconspirators on "troubleshooting" problem victims. ROA.209 (telling coconspirators to tell victims to tell their banks that money they were withdrawing was for a car or "to help a friend"), 210.

And the role adjustment was appropriate under Application Note 2. Moreira controlled the organization's assets: the fraud proceeds. Moreira not only instructed his coconspirators to tell victims how to send him money, once he received it he directed its distribution. ROA.195-96, 231-35, 272-76, 346 (summary chart), 371-92 (summary

charts). He bought fancy cars, clothing, shoes, and meals for himself.
ROA.234-35, 275 (victim money used to make payments on Infinity). He
paid prostitutes and bought them extravagant gifts. ROA.234-35. He
used it to go to "bars, and lounges, gentleman clubs." ROA.275. He sent
money to family and non-family in Nigeria. ROA.238, 254. He paid his
domestic coconspirators and engaged in trade-based money laundering
as a means to launder victim funds. ROA.195-96, 211-15, 231, 273-74.
The district court's finding that Moreira's conduct was sufficient was
not clearly erroneous. *See Delgado*, 672 F.3d at 345 (defendant
exercised control of drugs and trucks used to carry them and arranged
for transport and delivery of them); *United States v. Rose*, 449 F.3d 627,
633-34 (5th Cir. 2006) (manager/supervisor adjustment applied where
defendant did not recruit coconspirators, but determined if another
person would be part of conspiracy, had authority to decide what
"rigged bids" would be submitted, and was in control of competing for
accounts).

## B.     Moreira was necessary to the romance scam.

In Moreira's view, the court's conclusion that he "made things
happen" isn't supported by the record. Moreira Br. 22. But the record

reveals that Moreira was essential to the scam's success.

The district court correctly found that "in some ways, all roads led to Mr. Moreira". ROA.313. Many coconspirators did not know each other and Moreira "directed his co-conspirators on where and how money should be sent by victims, troublesh[ot] issues with victims and [told] them how to deal with victims, in addition to operating and maintaining these accounts." ROA.313-14 (also recognizing that the adjustment applied if Moreira "supervised only one other culpable participant" quoting *United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001)).

The evidence at sentencing was that "The scheme does not operate without Mr. Moreira." ROA.210. That is, it "doesn't exist without established bank accounts that money can move through." ROA.210. And to be successful, the bank accounts had to be in the United States. ROA.222. Moreover, without Moreira, his counterparts would be required to receive fraud proceeds directly from the victims. ROA.210-11. Moreira provided "operational security" by providing bank accounts unconnected with his cohorts, in the name of sham companies, and by instructing that cash be sent to a person who doesn't exist at an address

that allowed him to take delivery of it. ROA.210-11. Moreira directed

the part of the criminal organization charged in the indictment that was

in the United States. ROA.211.

## C. The criminal activity involved five or more participants or was otherwise extensive.

For the first time, Moreira claims that the district court reversibly

erred in applying the adjustment because the evidence was not

sufficient to show he was part of an organization that "consisted of more

than five people." Moreira Br. 20 (acknowledging that Agent Rennie

testified that Moreira communicated with about 32 coconspirators and

that the PSR "asserted" that he worked with 10-15 coconspirators in

Nigeria). The district court did not plainly err by implicitly concluding

that the criminal activity involved five or more people or was otherwise

extensive.

"More than one person involved in a conspiracy can qualify as a

leader or organizer for purposes of the enhancement, and a defendant's

role can be inferred from available facts." *United States v. Panos*, 634 F.

App'x 123, 127 (5th Cir. 2015) (unpublished) (citing *United States v.

Ventura*, 353 F.3d 84, 90 (1st Cir. 2003); *United States v. Cabrera*, 288

F.3d 163, 174-75 (5th Cir. 2002)). And all relevant conduct is considered

34

in applying the role adjustment. *Id*. (citing *United States v. Ismoila*, 100 F.3d 380, 395 (5th Cir. 1996); *United States v. Ceballos-Amaya*, 470 F. App'x. 254, 262 (5th Cir. 2012)).

"When assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." *United States v. Delgado*, 747 F. App'x 252, 254 (5th Cir. 2019) (unpublished) (citing U.S.S.G. § 3B1.1 cmt. n.3). "'Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.'" *United States v. Nowlin*, 640 F. App'x 337, 349 (5th Cir. 2016) (unpublished) (quoting U.S.S.G. § 3B1.1(a) cmt. n.3).

This record reveals that the criminal organization here involved more than five participants and was otherwise extensive. Consequently, the district court did not plainly err in applying U.S.S.G. § 3B1.1(b). To begin, while at least one member of the conspiracy perpetuated a Bitcoin scam, the court could appropriately consider that scam too. After all, Moreira profited from the scam; he received the fraud funds and managed assets from it.

Moreover, the FBI "positively identified" 10-20 scammers who

worked with Moreira. ROA.249. Ten to 15 of them were located in Nigeria. ROA.582 (¶ 41) (detailing text messages between Moreira and them). In total, Moreira communicated with about 32 coconspirators using WhatsApp. ROA.201-02. The reasonable conclusion was that the vast majority of them were part of the romance scheme, but because relevant conduct can be considered it doesn't really matter if some were perpetuating another scam. The evidence established by a preponderance that all of the 32 people identified as coconspirators were part of the criminal organization and that five or more participants generated over $4 million in fraud proceeds. Finally, bankers, FedEx workers, UPS and postal workers, and those operating wire transfer businesses were essential to the wire transfer conspiracy. The district court did not plainly err in its implicit finding that Moreira was a manager or supervisor that had five or more participants or was otherwise extensive. *See United States v. Aderinoye*, 33 F.4th 751, 756 n.2 (5th Cir. 2022) (no clear error where criminal activity was otherwise extensive consequently not addressing argument that scheme did not involve five or more participants); *United States v. Watson*, 813 F. App'x 969, 971 (5th Cir. 2020) (unpublished) (fraud involving less than five

participants using knowing services of many outsiders is extensive);
*United States v. Lopez-Perez*, 623 F. App'x 223, 224 (5th Cir. 2015)
(unpublished) (alternatively holding that even if individuals who
"received the wire transfers were unaware of participating in criminal
acts, the smuggling operation relied on their services" so the criminal
activity was otherwise extensive); *United States v. Tuma*, 738 F.3d 681,
694 (5th Cir. 2013) (court properly considered unknowing participants
in the scheme like truck drivers transporting wastewater and
contractors because they were essential to the crime, conspiring to
discharge untreated wastewater).

### Issue 3: The district court did not plainly err in applying a vulnerable-victim enhancement. (Responsive to Moreira Issues V & VI)

### Standard of Review

Generally, when a defendant challenges a vulnerable-victim
adjustment under U.S.S.G. § 3A1.1(b), this Court reviews the district
judge's interpretation of the guidelines de novo and his finding of
vulnerability for clear error. *United States v. Wilcox*, 631 F.3d 740, 753
(5th Cir. 2011). If the finding is "plausible in light of the record as a
whole," it is not clearly erroneous. *Id.*

However, when the defendant does not object to application of the adjustment, review is for plain error. *See United States v. Majors*, No. 20-40629, 2021 WL 5095505, at *1 (5th Cir. Nov. 2, 2021) (unpublished). Moreira admits that he did not object to application of the vulnerable-victim adjustment but asks the Court to apply the ordinary standard of review "for due process reasons". Moreira Br. 35. Plain-error review is appropriate because Moreira could have objected to the court's *sua sponte* imposition of the adjustment. Indeed, the district court informed the parties that it was considering applying the enhancement at the beginning of sentencing and offered Moreira extra time to review it. ROA.185-87. And Moreira's counsel ultimately agreed that it applied if the court found "that the majority was over 55." ROA.315-17. Review is for plain error.

Moreira must show a clear or obvious error, not just "one subject to reasonable dispute", that affected his substantial rights. *See id.* (citing *Puckett*, 556 U.S. at 135). If he does, the Court has discretion to correct the error, but will do so "only if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up).

**Discussion**

The sentencing guidelines provide for a two-level adjustment "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The commentary defines "vulnerable victim" to mean "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to *age*, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2 (emphasis added). An additional two-point increase applies if the offense involved a "large number" of vulnerable victims. U.S.S.G. § 3A1.1(b)(2). In this case, the district court found that the first two-level adjustment, but not the second, applied. ROA.318-19.

The enhancement "is primarily focused on the diminished ability of the victim to thwart or resist the crime at hand." *United States v. Swenson*, 25 F.4th 309, 321 (5th Cir. 2022). "One of the specific categories of vulnerable victims we have found are those who are 'less able to resist than the typical victim of the offense of the conviction.'" *Id.* (quoting *Wilcox*, 631 F.3d at 755).

Moreira argues that the court clearly erred because, in his view, it "improperly inferred" that victims who provided victim impact statements were "representative" of those who didn't; the court's conclusion that elderly victims were targeted wasn't supported by the evidence; and the evidence didn't show that Moreira knew that vulnerable victims were targeted. Moreira Br. 37-41. He implies that the district court's finding of vulnerability was based solely on the age of the victims. Moreira Br. 42-43. Moreira's assessment of the record is wrong and so is his understanding that such victims must be *targeted*.

The district court's view of the victims of Moreira's crime was not erroneous, plainly or otherwise. The court correctly recognized that the evidence showed that "many" of the victims were "over 55." ROA.319. It also pointed out that many of them were "emotionally vulnerable" because they were widowed or recently divorced. ROA.319. The court also stated, "leaving aside everything else, … the fact that these are … clearly older people … and/or otherwise susceptible to this crime" merits application of the adjustment. ROA.319. Thus, because the court assessed the mental and emotional condition of the victims, its finding that the victims were unusually vulnerable was not clear error. *See*

*United States v. Smith*, 930 F.2d 1450, 1456 (10th Cir. 1991)

(remanding for further proceedings where court applied enhancement

solely on "elderly" status without considering their mental condition).

The record supports the district court's finding.

Elderly victims were especially susceptible to the scam because

they were trusting, inexperienced internet users who didn't perceive the

risks in interacting with the scammers and sending them money.

ROA.193. And the victims were also vulnerable because they were

looking for companionship due to the loss of a loved one (by death or

divorce) and had accumulated wealth that they could use to help others

who they cared about. ROA.193.

Indeed, the record provides evidence about the susceptibility of

Moreira's individual victims. For instance, D.S. was 65 and recently

divorced when Moreira conspired to steal almost $200,000 from her. She

trusted "a stranger" and was at the "most vulnerable time of [her] life."

ROA.324. Similarly, Maryann was recently widowed and was at a

"vulnerable period in [her] life" when Moreira and his coconspirators

defrauded her of her personal bank account savings, retirement

account, and investment funds. ROA.583 (¶ 46). And Marylin was 82

and recently widowed when Moreira conspired to hoodwink her to the tune of roughly $140,000. ROA.584 (¶ 48).

In this case, the court's finding was common sense, not error, plain or otherwise. The court could plausibly conclude that D.S., Maryann, Marylin, and many other victims were "less able to resist" being tricked out of their life savings than is the "typical victim." *See Wilcox*, 631 F.3d at 755 (quotation omitted); *cf. United States v. Thomas*, 384 F. App'x 394, 397 (5th Cir. 2010) (unpublished) (affirming enhancement where carjacking victims "were an elderly husband and wife, who were 81 and 78 respectively"); *United States v. Brown*, 7 F.3d 1155, 1160 (5th Cir. 1993) (affirming enhancement where fraud victims "fit the description of a lonely, elderly widow seeking attention and companionship" and were "particularly susceptible to the conspirators' manipulation and deceit").

Moreira seems to argue that the government failed to show a sufficient number of victims were vulnerable. Moreira Br. 37 (arguing there was no proof that 12 victims who submitted impact statements were representative of other victims). The government wasn't required to show any particular quantity of victims fit the criteria. The two-point

offense-level increase was appropriate because "the defendant knew or should have known that *a* victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1) (emphasis added). Notably, neither the government, nor the probation office, nor the court believed that the additional two-point increase applied. It was enough that the scammers defrauded a single unusually vulnerable victim, so the court did not err. *See United States v. Biyiklioglu,* 716 F. App'x 270, 273 (5th Cir. 2017) (unpublished) (adjustment correctly applied where a preponderance of the evidence showed that at least one victim was unusually vulnerable).

Moreover, in claiming that "it is wholly unclear how the co-conspirators would or could have targeted widows", Moreira Br. 38, Moreira seeks to impose a proof requirement that does not exist. It is enough that Moreira and his coconspirators bamboozled elderly, emotionally vulnerable victims. The government is not required to show that the intention was to target vulnerable victims. This Court has squarely held that § 3A1.1(b) "does not require that the defendant chose victims based on vulnerability, but only that he knew or should have known of the vulnerability." *United States v. Dock*, 426 F.3d 269, 274 (5th Cir. 2005); *see United States v. Burgos*, 137 F.3d 841, 843 (5th Cir.

1998) (per curiam) ("we have not required a specific 'targeting' of a vulnerable victim"); *see also United States v. Patel*, 485 F. App'x 702, 719 (5th Cir. 2012) (unpublished) (same); *United States v. Coe*, 482 F. App'x 954, 955 (5th Cir. 2012) (unpublished) (same). Naturally then, the government is not required to prove the method used to identify vulnerable victims.

Lastly, the record belies Moreira's claim that there wasn't proof that "he knew or had reason to know" that his victims were unusually vulnerable. *Contra* Moreira Br. 40. The record reveals that Moreira had direct knowledge that elderly, vulnerable victims were being scammed. His cellphone contained an audio clip of an elderly woman begging for her money to be returned. ROA.218, 361 (audio clip). And text messages on the same phone made clear that victims were deceived through a romance scam. ROA.218-21, 362-63 (sample of text messages). The district court reasonably concluded based on a preponderance of the evidence that Moreira knew or should have known of the vulnerable victims.

Moreira has failed to show that the district court committed reversible error, plain or otherwise, by adding two levels under U.S.S.G.

44

§ 3A1.1(b)(1). Nor has Moreira shown that any such error affected his substantial rights. Recognizing that the district court explicitly said it would impose the same sentence even if its guideline calculation was wrong, Moreira argues that the district court's "claim is difficult to accept". Moreira Br. 44. In his view, the court relied on its allegedly erroneous factual findings to support the 168-month sentence under the statutory sentencing factors. Moreira Br. 44.

To begin, Moreira must show error that affected his substantial rights. That means it must have "affected the outcome of the district court proceedings." *United States v. Nava*, 762 F.3d 451, 452 (5th Cir. 2014) (quotation omitted). That is, he must show "'a reasonable probability that, but for the district court's misapplication of the Guidelines, he would have received a lesser sentence.'" *United States v. McGavitt*, 28 F.4th 571, 577 (5th Cir. 2022) (quoting *United States v. Islas-Saucedo*, 903 F.3d 512, 520 (5th Cir. 2018)).

This Court "owes deference to the district court's determination of the appropriate sentence based on the § 3553(a) factors and may not reverse the district court's ruling just because it would have determined that an alternative sentence was appropriate." *United States v.*

*Brantley*, 537 F.3d 347, 349 (5th Cir. 2008). And district courts may "rely on factors already incorporated by the Guidelines to support a non-Guidelines sentence." *United States v. Hudgens*, 4 F.4th 352, 358-59 (5th Cir. 2021) (internal quotation omitted).

In this case, the district court essentially relied on four statutory sentencing factors in concluding that it would impose the same sentence if its guideline calculation was wrong. The court considered: the nature and circumstances of the offense; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; the need for the sentence to provide adequate deterrence; and the need for the sentence to protect the public from further crimes. Each of those factors is appropriate under 18 U.S.C. § 3553(a).

As discussed in Issue 1, *supra*, the court stated a 168-month sentence was justified because Moreira defrauded "unwitting victims, many of whom were elderly" "using social online platforms" and "false identities and false stories to befriend and romance their victims." ROA.615. Additionally, Moreira spent the ill-gotten gains for "personal purchases, such as luxury vehicles, trips, and clothing" and "to pay

prostitutes." ROA.615. The scope of his offenses is "staggering" because it involved "at least 97 victims" and caused "losses exceeding four million dollars." ROA.615. It is equally "despicable" because his actions inflicted "incalculable[ and] devastating harm" on "so many victims." ROA.615. Moreira "ruined and destroyed" "many lives", and many of his victims are unable to recover due to their "advanced years". ROA.615. The court explicitly stated that such sentence was justified due to "the risk he presents to the public of committing similar crimes in the future" and that it "provides just punishment, adequately sanctions the Defendant's criminal conduct, and promotes respect for the law." ROA.615. It is hard to imagine that the court would impose a shorter sentence in light of these factors even if it miscalculated the guideline range. The totality of the sentencing factors justifies a 168-month sentence even if an upward departure would have been required.

### Issue 4: The district court did not plainly err by failing to hold the government to a higher standard of proof at sentencing. (Responsive to Moreira Issue VII)

## Standard of Review

Moreira never requested, nor otherwise preserved his claim, that the district court should hold the government to a higher burden of

proof at sentencing. This claim is reviewed for plain error. *See, e.g.,*
*United States v. Olano*, 507 U.S. 725, 732-37 (1993).

## Discussion

Moreira's final claim is that the circumstances surrounding his
case warranted the use of a heightened standard of proof at sentencing.
He is wrong, especially given that review is for plain error.

This Court has repeatedly held that the preponderance standard
applies at sentencing even where enhancements significantly increase
the guideline range. *See, e.g., United States v. Brooks*, 681 F.3d 678, 713
(5th Cir. 2012) (proof beyond preponderance not required to prove
enhancement increasing sentencing range from 8-14 months to 94-121
months); *United States v. Carreon*, 11 F.3d 1225, 1240 (5th Cir. 1994)
(increase in recommended sentence from six to 20 years did not require
proof beyond a preponderance). This reasoned doctrine is consistent
with decisions from other circuits. *See, e.g., United States v. Villareal-*
*Amarillas*, 562 F.3d 892, 897 (8th Cir. 2009) ("due process never
requires applying the clear-and-convincing standard to judicial fact-
finding at criminal sentencing"); *United States v. Reuter*, 463 F.3d 792,
793 (7th Cir. 2006) (the tail-wagging-dog concern was rendered

"academic" after *Booker*). In fact, only one circuit court has employed the clear and convincing standard at sentencing. *United States v. Staten*, 466 F.3d 708, 718 (9th Cir. 2006) (due process required proof by clear and convincing evidence where enhancement doubled the sentence).

Moreira has not established that the district court should have used a heightened standard, clear-and-convincing or otherwise. His guideline range was increased based, *inter alia,* on loss amount, his role in the fraud scheme, and that the scheme involved vulnerable victims. ROA.586-88. He does not argue that the disparity between his guideline range with and without the enhancements warranted a heightened standard of proof. Moreira 45-48. Rather, in his view, a greater burden is justified because his counsel was not able to review discovery before sentencing (due to the pandemic and an agreed protective order) and was ineffective. Moreira Br. 46-48. He cites no case authority in which this Court or any other has adopted his argument. Moreover, the record belies his claim that counsel had not reviewed the government's evidence before sentencing and the record isn't sufficient to review his claim of ineffective assistance of counsel. In short, his argument for a

heightened standard does not establish plain error.

This Court has recognized that "in some circumstances, proof of sentencing facts by clear and convincing evidence may be required." *Simpson*, 741 F.3d at 558-59 (citing *United States v. Mergerson*, 4 F.3d 337, 343-44 (5th Cir. 1993)). But the Court has "never" actually required a heightened burden for factual determinations at sentencing. *Brooks*, 681 F.3d at 712-13 (clear and convincing evidence not required to prove enhancement increasing sentencing range from 8-14 months to 94-121 months).

First, Moreira agreed to the protective order, and it was obviously intended to protect victims from disclosure of their personal information including their names. *See* ROA.38-40. Moreover, the protective order allowed defense counsel, the defendant, and members of defense counsel's staff to access and view all discovery material. ROA.41.

And the record shows that nothing about COVID-19 protocols affected his attorney's review of the evidence before sentencing. Indeed, it shows the opposite because it makes clear that counsel reviewed all of Moreira's bank accounts in advance. While Moreira's objections to the initial PSR reveal that counsel had examined only six of his accounts

when it was drafted, Moreira Br. 47 (citing ROA.458), months later at sentencing after hearing testimony and seeing charts demonstrating that Moreira established 19 bank accounts, counsel said, she had reviewed "all the bank accounts[.]" ROA.295. Presumably, she reviewed all the rest of the discovery. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (counsel is strongly presumed to act within the "wide range" of reasonable professional assistance). Indeed, there was no objection to the admission of the charts the CPA prepared particularly the one accounting to the loss by individual victim. ROA.277-78, 395-96 (Govt. Exhibit 6).

Moreover, Moreira's belated criticism of his counsel doesn't establish that she was ineffective and the record casts serious doubt on his claim. At the start of sentencing, Moreira declared that he had reviewed the PSR with counsel and understood it. ROA.182. Likewise, his counsel acknowledged that she had discussed the PSR with Moreira and believed he understood it. ROA.183. Moreira's claim that his counsel was ineffective is not only premature because it wasn't presented to the district court, *see, e.g., United States v. Alvarez*, 764 F. App'x 425, 426 (5th Cir. 2019) (unpublished) (citing *United States v.*

*Isgar*, 739 F.3d 829, 841 (5th Cir. 2014)), it is also not supported by the record. Nothing about the circumstances surrounding Moreira's sentencing requires a heightened evidentiary burden.

## Conclusion

For these reasons, the Court should affirm Moreira's sentence.

Respectfully submitted,

Damien M. Diggs
United States Attorney
Eastern District of Texas

/s/ *Terri L. Hagan*
Terri L. Hagan
Assistant U.S. Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
Telephone: (972) 509-1201

Attorneys for the United States

## Certificate of Service

I certify that on June 26, 2023, a copy of this brief was served by the Court's ECF system on Jason B. Freeman, appellant's counsel.

/s/ *Terri L. Hagan*
Terri L. Hagan

## <u>Certificate of Compliance</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 9,924 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Word 2010 in a proportionally spaced typeface in 14-point size, with footnotes in 12-point size.

/s/ <i>Terri L. Hagan</i>
Terri L. Hagan